UNITED STATES of America, Plaintiff,

v.

DALLAS COUNTY COMMISSION, et al., Defendants.

Civ. A. No. 78–578–H.

United States District Court,
S. D. Alabama, N. D.

Sept. 10, 1982.

See also, D.C., 548 F.Supp. 794.

W. A. Kimbrough, Jr., U. S. Atty., Mobile, Ala., J. Gerald Hebert and Ellen M. Weber, Voting Section, Civ. Rights Div., Dept. of Justice, Washington, D. C., for plaintiff.

Joe T. Pilcher, Jr., Selma, Ala., for Dallas County Bd. of Educ., et al.

Cartledge W. Blackwell, Jr., W. McLean Pitts, William T. Faile, Selma, Ala., for Dallas County, Ala., et al.

Edward S. Allen, Birmingham, Ala., for Robert Douglas, etc.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HAND, Chief Judge.

This action was filed on October 19, 1978 by the United States of America acting through the Attorney General. The named defendants are the Dallas County Commission and its members (L. Seawell Jones, W. H. Kendrick succeeding R. F. Ellis, C. Stanley Baldwin and Gene Norris succeeding Andrew Calhoun); Judge of Probate John W. Jones, Jr., who serves as Chairman Ex-Officio of the Dallas County Commission; the Dallas County Board of Education and its members (William R. Martin, as Chairman, John J. Grimes, Sr., Martin Chance, Joe K. Rives and James N. Priestley); the Chairman of the Dallas County Democratic Executive Committee and the Chairman of the Dallas County Republican Executive Committee. The political party committee chairmen were joined as parties for relief purposes only and did not participate in the action.

This action was filed at about the same time as the Government's suit against the Marengo County Commission and Board of Education, see *United States of America v. Marengo County Commission, et al.,* decision reported at 469 F.Supp. 1150. As in Marengo County there was a prior lawsuit filed by private plaintiffs (in the case of Dallas County being *Tyus, et al. v. Dallas County, Alabama, et al.,* Civil Action No. 77–152–H). Unlike the Marengo County cases, the *Tyus* lawsuit in Dallas County did not proceed and was dismissed with prejudice on motion of counsel for the plaintiff in that action on October 23, 1978.

The allegations of the complaint are that the at-large election of County Commission members unconstitutionally dilute or cancel the voting strength of the black population in violation of the Fourteenth and Fif-

teenth Amendments to the United States Constitution and in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. §§ 1971, 1973. The Government requests that the Court declare the at-large election method employed in the election of both County Commission and School Board members to be violative of the Fourteenth and Fifteenth Amendments and the Voting Rights Act, to enjoin any future at-large elections, and to require the adoption of an election system employing single-member districts. The county commission and school board defendants each filed answers denying that any aspect of the election method in Dallas County has served to deprive black persons of the right to vote or has diluted or cancelled out their voting strength. The defendants filed various motions to dismiss, all of which were denied by the Court. The defendants' answers deny jurisdiction.

The Court has jurisdiction over the Plaintiff's claims under 42 U.S.C. § 1971, 42 U.S.C. § 1973j(f), and 28 U.S.C. § 1343.

The at-large method of election of the membership of the governing body of Dallas County, Alabama was previously challenged in Court on a one-man, one-vote theory and the method was upheld, see *Dallas County, Alabama, et al. v. Reese,* 421 U.S. 477, 95 S.Ct. 1706, 44 L.Ed.2d 312 (1975).

## GENERAL FINDINGS OF FACT

1. Dallas County, Alabama is located in the Blackbelt area of Alabama in the central part of the state. It is bordered by Perry, Wilcox, Lowndes, Autauga and Chilton Counties. The total population of the County, according to the 1970 Census, was as follows:

| White | 26,330 | 47.6% |
|---|---|---|
| Black | 28,892 | 52.3% |
| Other | 74 | .1% |
| Total Population | 55,296 | |

(See Paragraph 4(a)22 of Pretrial Order) The census further reflects that there are 17,611 whites of voting age (53%) and 15,-

456 blacks of voting age (47%). (See Paragraph 4(a)23 of Pretrial Order).

The Dallas County Commission, previously known by the name Dallas County Board of Revenue and Court of County Commissioners, was created by enactment of the Legislature of Alabama in 1901. Act No. 328 of the Legislature of Alabama 1900–1901 (approved February 8, 1901) at 892. The act provided for four commissioners to be elected by the county at-large electorate with a district residency requirement. The Judge of Probate serves as Chairman Ex-Officio, voting only in the case of a tie.

Prior to the 1901 statute, from 1876 members of the governing body of Dallas County were appointed by the Governor of Alabama under the provisions of Act No. 265 of the Legislature of Alabama 1875–1876 approved (February 19, 1876) at 385. Prior to the 1876 statute the members of the governing body of Dallas County were elected by the county at-large electorate under the general state codes.

The Dallas County Board of Education is elected under the provisions of Chapter 8 of Title 16 of the Code of Alabama of 1975, which statute generally derives from Act No. 220 of the Acts of Alabama of 1915.

The Plaintiff and the Defendants entered into a joint Pretrial Order which was approved by the Court and which constitutes a final statement of the issues involved, governed the conduct of the trial and constitutes the basis for any relief afforded by the Court. In that Pretrial Order the parties were unable to agree as to the jurisdiction and the propriety of the parties, and those issues were certified to the Court for resolution. In the Pretrial Order the parties also stipulated to a number of uncontested facts, which stipulations were adopted by the Court and constitute a part of the Findings of Fact hereinafter made. The Plaintiff and the Dallas County Board of Education and its members also stipulated, agreed, and consented in the Pretrial Order that the Court shall and may take judicial notice of the entire record and proceedings in Civil Action No. 5945–70–H pending in this Court and styled: *Anthony T. Lee, et al., Plaintiff, United States of America, et al., Plaintiff-Intervenor vs. Dallas County Board of Education, et al., Defendants.* Said parties stipulated and agreed that the Court may take judicial notice of all documents, evidence and testimony taken and received into evidence in that action, and that any and all orders and trial exhibits admitted into evidence in that action may be considered as evidence in this action. Pursuant to that stipulation, agreement, and consent of said parties, the Court has considered and taken judicial notice of the entire record and proceedings in said Civil Action No. 5945–70–H, including all documents, evidence and testimony taken and received into evidence therein.

In and by the terms of that Pretrial Order, the parties also stipulated, agreed and admitted that the following were and constituted all of the Contested Issues of Fact in this action:

a. Whether as a result of the at-large electoral system used to elect the members of the Dallas County Commission and the Dallas County Board of Education, black citizens of the county have less opportunity than do white citizens to participate in the political process and to elect members of their choice to these governing bodies.

b. Whether the at-large electoral system unlawfully dilutes the voting strength of black voters, and whether black voters are largely concentrated in certain geographic areas of the County.

c. Whether voting for state, district, county and local offices in Dallas County has followed racial lines.

d. Whether black candidates have ever been elected to the Dallas County Commission or the Dallas County Board of Education.

e. Whether a black person has ever been the nominee of the Democratic party or the Republican party for a position on the Dallas County Commission or the Dallas County Board of Education.

f. Whether there has been a lack of responsiveness by the Dallas County Commission and the Dallas County Board of

Education to the needs of the black citizens and voters of Dallas County.

g. Whether the State of Alabama and Dallas County have in the past unlawfully discriminated against black residents of Dallas County by disenfranchising black voters through the use of discriminatory devices such as literacy tests, poll taxes and by applying more stringent registration requirements to black prospective voters.

h. Whether black voters of Dallas County have also been the subject of unlawful discrimination in education, employment, housing, public accommodations and public facilities.

i. Whether there is a past history of racial discrimination in Dallas County by state, local and party officials, particularly with respect to public education and minority participation in the electoral process, and if so, whether the same adversely affects minority participation in the political process.

j. Whether there is a firm, long-standing state policy favoring the at-large election of the Dallas County Commission.

k. Whether there is a firm, long-standing state policy favoring the at-large election of the Dallas County Board of Education as stipulated and specified in Chapter 8 of Title 16 of the 1975 Code of Alabama.

l. Whether there is a firm, long-standing state policy favoring the at-large election of members of the County Commissioners or other county governing bodies in the State of Alabama.

m. Whether there is a firm, long-standing state policy favoring the at-large election of members of county Boards of Education in the State of Alabama.

n. Whether the at-large electoral method adversely affects minority participation in the electoral process.

o. Whether the majority vote requirement for primary elections, residency districts for members of the Dallas County Commission, and numbered places and staggered terms for the members of the Dallas County Board of Education dilute minority voting strength in the context of the at-large electoral system.

p. Whether black citizens of Dallas County have full and complete access to the process of slating and electing candidates for nomination and election to the Dallas County Commission and the Dallas County Board of Education and other elective offices in Dallas County.

q. Whether the Dallas County Commission and its defendant members have been responsive to the particularized needs of black students within the school system and black citizens of Dallas County.

r. Whether the Dallas County Board of Education and its defendant members have been responsive to the particularized needs of black students within the school system and black citizens of Dallas County.

s. Whether the policy and general laws of the State of Alabama favor and prescribe at-large elections for members of the Dallas County Board of Education and other County Boards of Education.

t. Whether the policy and general laws of the State of Alabama favor and prescribe at-large elections for members of county governing bodies.

u. Whether there has been any past discrimination against black citizens of Dallas County which now precludes the effective participation of black citizens in the election system.

v. Whether there has been racially motivated discrimination or action by any of the Defendants that infringes on the constitutional rights of black citizens of Dallas County.

w. Whether there is or has been any invidious racial motivation or at-large scheme to deny black citizens effective participation in the election of members of the Dallas County Commission or the Dallas County Board of Education.

x. Whether intentional and invidious racial discrimination was a motivating factor in the enactment of the laws and procedures of the State of Alabama prescribing and governing the election of members of the Dallas County Commission.

y. Whether intentional and invidious racial discrimination was a motivating factor in the enactment of the laws and procedures of the State of Alabama prescribing and governing the election of members of the Dallas County Board of Education.

z. Whether intentional and invidious racial discrimination was a motivating factor in the maintenance of the laws and procedures of the State of Alabama prescribing and governing the election of the members of the Dallas County Commission.

aa. Whether intentional and invidious racial discrimination was a motivating factor in the maintenance of the laws and procedures of the State of Alabama prescribing and governing the election of members of the Dallas County Board of Education.

bb. Whether as a matter of law intentional racial discrimination as a motivating factor in the maintenance of the laws and procedures of the State of Alabama which prescribe and govern the election of members of the Dallas County Board of Education and the Dallas County Commission would afford Plaintiffs any cause of action or right to relief in this action, even should such be found to have existed.

On November 26, 1979, this action came on for trial before the Court, without a jury, pursuant to and on the basis of the issues made and stipulated by the Pretrial Order. Trial proceedings were held on November 26, 27, 28, 29 and 30, 1979, and were then recessed without date. Thereafter, trial proceedings were resumed on March 10, 1980, and were held on March 10, 11, 12, 13, 14, 17, 18 and 19, 1980.

On March 12, 1980 the Plaintiff completed the presentation of its evidence, and rested. At that time, the Defendants, Dallas County Board of Education of Dallas County, Alabama and its members, William R. Martin, as Chairman and member, John J. Grimes, Sr., as Vice-Chairman and member, and Martin Chance, Joe K. Rives and James N. Priestley, as members (said School Board and its said members and officers are hereinafter collectively called the School Board) filed their Motion for Involuntary

Dismissal under Rule 41(b) of the Federal Rules of Civil Procedure, seeking a dismissal of the Complaint and the action on the ground that upon the facts and the law the Plaintiff has shown no right to relief. Similar Motions for Involuntary Dismissal were also filed at that time on behalf of the Probate Judge and the Dallas County Commission and its members.

On October 13, 1981 the trial resumed and was heard on that day and October 14, 15, 16, 20, 21, 22, 27 and 28, 1981, completing the defense presentation of the County Commission defendants.

## FINDINGS OF FACT

1. The Defendant, Dallas County Commission, is a body established under the laws of the State of Alabama with all powers conferred upon it by the statutes and laws of the State of Alabama. (Pretrial Order Paragraph 4(a)1.)

2. John W. Jones is the Probate Judge of Dallas County and serves as Chairman Ex-Officio of the Dallas County Commission and is responsible for exercising certain powers and duties associated with conducting elections in Dallas County, Alabama, for the Dallas County Commission and the Dallas County Board of Education as well as for other public offices. (Pretrial Order Paragraph 9(a)2.)

3. L. Seawell Jones, William H. Kendrick, C. Stanley Baldwin and Gene Norris reside in Dallas County, Alabama and are duly elected members of the Dallas County Commission. (Pretrial Order Paragraph 4(a)3.)

4. The Defendant, Dallas County Board of Education, is the body established under the laws of the State of Alabama which is responsible for governing and administering the Dallas County public school system pursuant to the laws of the State of Alabama. (Pretrial Order Paragraph 4(a)4.)

5. The Defendants, Martin Chance, James N. Priestley, John J. Grimes, Sr., William R. Martin and Joe K. Rives are residents of Dallas County, Alabama, and are the duly elected members of the Dallas

County Board of Education, with the Defendant William R. Martin, serving as Chairman and the Defendant John J. Grimes, Sr., serving as Vice-Chairman. (Pretrial Order Paragraph 4(a)5.)

6. The composition, election and qualifications of the Dallas County Board of Education are governed by the provisions of Chapter 8 of Title 16 of the 1975 Code of Alabama, as are the County Boards of Education of the 35 counties of the State of Alabama as enumerated above under 2(b) Propriety of Parties. The parties agree that this paragraph may be amended should subsequent research require amendment. (Pretrial Order Paragraph 4(a)6.)

7. The superintendents of schools for Greene County, Lowndes County, Macon County, Perry County, and Bullock County are black, and their names are as follows:

| COUNTY | SUPERINTENDENT OF SCHOOLS |
| --- | --- |
| Greene County | Mr. Robert Brown |
| Lowndes County | Mrs. Uralee Haynes |
| Macon County | Mr. Alonzo Harvey |
| Perry County | Mr. Earnest Palmer |
| Bullock County | Mr. Conrad Newman |

(Pretrial Order Paragraph 4(a)7.)

8. The County Boards of Education for the following counties in Alabama have one or more black members and the composition, election, qualification and terms of office of said County Boards of Education are governed by Chapter 8 of Title 16 of the 1975 Code of Alabama:

| COUNTY | NUMBER OF BLACK BOARD MEMBERS |
| --- | --- |
| Bullock County | 5 |
| Elmore County | 1 |
| Greene County | 5 |
| Lowndes County | 4 |
| Macon County | 4 |
| Perry County | 4 |
| Sumter County | 2 |

(Pretrial Order Paragraph 4(a)8.)

9. The Defendant, Earl Goodwin, resides in Dallas County, Alabama, and is Chairman of the Dallas County Democratic Executive Committee and as such is responsible to provide to the Probate Judge the names of all Democratic candidates nominated to county office. (Pretrial Order Paragraph 4(a)9.)

10. The Defendant, Robert Douglas, resides in Dallas County, Alabama, and is Chairman of the Dallas County Republican Executive Committee and as such is responsible to provide to the Probate Judge the names of all Republican candidates nominated to county office. (Pretrial Order Paragraph 4(a)10.)

11. The members of the Dallas County Commission are presently elected pursuant to Act 328, Section 6, Local Acts of Alabama, 1901. (Pretrial Order Paragraph 4(a)11.)

12. Under the terms of Act No. 328, Dallas County is divided into four residency districts for the election of county commissioners: the City of Selma and the Fork (North), South and West districts. Candidates for positions as members on the Commission must reside in a residency district but each member, as well as the Chairman (Probate Judge), is elected by the qualified voters of Dallas County, at-large. The Probate Judge and the four members are elected to concurrent, four-year terms. (Pretrial Order Paragraph 4(a)12.)

13. The members of the Dallas County Board of Education are presently elected pursuant to Chapter 8 of Title 16 of the 1975 Code of Alabama and other laws of the State of Alabama generally governing elections. (Pretrial Order Paragraph 4(a)13.)

14. Under the terms of the Alabama Code Title 16–18–1 et seq., each member of the Dallas County Board of Education is elected by the qualified voters of Dallas County on an at-large basis, by numbered places, to six-year terms which are staggered. (Pretrial Order Paragraph 4(a)14.)

15. There are no majority vote requirements in any general elections held in the State of Alabama. The laws governing primary elections require a majority vote for nomination. (Pretrial Order Paragraph 4(a)15.)

16. Political parties have the opportunity under the laws of the State of Alabama to nominate candidates by means of caucus

and convention. (Pretrial Order Paragraph 4(a)16.)

17. There are no anti-single shot voting provisions in the general election laws governing the election of members of the Dallas County Commission, the Dallas County Board of Education and other elective offices in Alabama. Candidates for nomination and election to the Dallas County Commission and the Dallas County Board of Education run for a single office or position. (Pretrial Order Paragraph 4(a)17.)

18. There are no anti-single shot voting provisions in the primary election for the nomination of candidates for the election of members of the Dallas County Commission, the Dallas County Board of Education, and other elective offices in Alabama. Candidates for nomination and election to the Dallas County Commission and the Dallas County Board of Education run for a single office or position. (Pretrial Order Paragraph 4(a)18.)

19. Prior to the Voting Rights Act of 1965, requirements for registering to vote in the State of Alabama included a literacy test, a poll tax, and a voucher of good character from a registered voter. (Pretrial Order Paragraph 4(a)19.)

20. Plaintiff's Exhibit "1" accurately states and reflects the results of all primary and general elections held in Dallas County for the years since 1964. (Pretrial Order Paragraph 4(a)20.)

21. Plaintiff's Exhibit "2" accurately states the number of persons registered to vote, by race, in Dallas County, Alabama for the dates therein specified. (Pretrial Order Paragraph 4(a)21.)

22. The total population, the total number and percentage of white persons, and the total number and percentage of black persons in Dallas County, Alabama, according to the 1970 Census, are as follows:

| White: | 26,330 | 47.6% |
| Black: | 28,892 | 52.3% |
| Other: | 74 | .1% |
| Total Population: | 55,296 | |

(Pretrial Order Paragraph 4(a)22.)

23. The total voting age population, the total number and percentage of white persons of voting age, and the total number and percentage of black persons of voting age in Dallas County, Alabama, according to the 1970 Census, are as follows:

| White: | 17,611 | 53% |
| Black: | 15,456 | 47% |
| Total Population: | 33,116 | |

(Pretrial Order Paragraph 4(a)23.)

24. The population for the following counties as of July 1, 1976 is substantially and approximately as shown below and by population estimates prepared by the University of Alabama for each of the aforesaid thirty-five counties whose County Boards of Education are elected and governed pursuant to the provisions of Chapter 8 of Title 16 of the 1975 Code of Alabama:

| COUNTY | WHITE POPULATION | NON–WHITE POPULATION | TOTAL POPULATION |
| --- | --- | --- | --- |
| Baldwin | 58,026 | 11,474 | 69,500 |
| Barbour | 14,701 | 11,399 | 26,100 |
| Bibb | 10,450 | 3,750 | 14,200 |
| Bullock | 4,023 | 7,577 | 11,600 |
| Calhoun | 94,658 | 18,942 | 113,600 |
| Cherokee | 16,637 | 1,563 | 18,200 |
| Chilton | 24,685 | 3,615 | 28,300 |
| Coffee | 30,128 | 5,572 | 36,700 |
| Colbert | 41,430 | 7,970 | 49,400 |
| Covington | 29,733 | 5,367 | 35,100 |
| Dale | 36,430 | 5,270 | 41,700 |
| Dallas | 28,448 | 27,752 | 56,200 |
| Elmore | 29,874 | 10,026 | 39,900 |

| COUNTY | WHITE POPULATION | NON–WHITE POPULATION | TOTAL POPULATION |
|--------|------------------|----------------------|------------------|
| Escambia | 24,766 | 11,134 | 35,900 |
| Fayette | 14,395 | 2,105 | 16,500 |
| Franklin | 25,346 | 1,254 | 26,600 |
| Greene | 2,892 | 7,808 | 10,700 |
| Houston | 54,303 | 15,397 | 69,700 |
| Lamar | 13,521 | 2,079 | 15,600 |
| Lee | 54,657 | 15,043 | 69,700 |
| Lowndes | 3,340 | 10,060 | 13,400 |
| Macon | 5,043 | 21,557 | 26,600 |
| Marshall | 58,371 | 1,229 | 59,600 |
| Monroe | 12,289 | 9,511 | 21,800 |
| Perry | 5,893 | 7,507 | 13,400 |
| Pike | 15,955 | 7,345 | 23,300 |
| Randolph | 14,849 | 4,051 | 18,900 |
| Russell | 26,242 | 20,358 | 46,600 |
| Shelby | 43,723 | 7,877 | 51,600 |
| Saint Clair | 29,965 | 4,335 | 34,300 |
| Sumter | 7,079 | 10,621 | 17,700 |
| Talladega | 47,161 | 20,739 | 67,900 |
| Tallapoosa | 97,243 | 27,857 | 125,100 |
| Wilcox | 5,667 | 9,333 | 15,000 |

(Pretrial Order Paragraph 4(a)24.)

25. The election of members of the County Board of Education of the following counties are governed by local acts and are not governed by the provisions of Chapter 8, Title 16, of the 1975 Code of Alabama: Autauga, Blount, Butler, Chambers, Choctaw, Clarke, Clay, Cleburne, Conecuh, Coosa, Crenshaw, Cullman, Dekalb, Etowah, Geneva, Hale, Henry, Jackson, Jefferson, Lauderdale, Lawrence, Limestone, Madison, Marengo, Marion, Mobile, Montgomery, Morgan, Pickens, Walker, Washington, and Winston. The parties agree that this provision may be amended should subsequent research require. (Pretrial Order Paragraph 4(a)25.)

26. Plaintiff's Exhibit "3" constitutes true and correct census maps showing enumeration districts for the City of Selma and Dallas County based on the 1970 census figures with data showing the breakdown by race for each enumeration district, and the same are stipulated to be correct and may be used in evidence. (Pretrial Order Paragraph 4(a)26.)

27. Regarding the State policy concerning the election of members of the governing body of Dallas County, Alabama, there is a long-standing policy of election of such members by at-large election. From 1819 through 1875, and from 1901 to the present the selection has been by at-large election, with only the period of appointment by the Governor from 1876–1900 otherwise. This Court has previously addressed the State policy covering at-large election of County Commission members as respects all of Alabama's counties (there are presently 67). In the opinion of this Court in the Marengo County referenced hereinabove this Court stated:

34. It cannot be said that the at-large scheme is unusual in the context of election procedures in other Alabama counties, since previous cases have recognized that half of the Alabama counties have at-large elections, see *Hendrix v. Joseph,* 559 F.2d at 1269 (5th Cir. 1977); *Reese v. Dallas County,* 505 F.2d 879, 882 N.2 (5th Cir. 1974), and it appears that presently 50 of the 67 counties have at-large procedures. Defendants' post-trial brief at 44, 60–79. Indeed, the defendants' calculations indicate that 47 Alabama counties (70.1%) have had at-large procedures for a majority of the time since 1850. Such at-large procedures are specifically permitted by statute. Ala.Code 11–3–1. So

it is quite clear that Marengo County election procedures are in no way rare or unique in comparison to other Alabama counties, but rather are exemplary of the typical policy followed in most counties. The Court, however, is not convinced that such evidence indicates a state policy in favor of the Marengo County procedure, the Court rather being of the opinion that, as in *Bolden,* [*v. City of Mobile,* 423 F.Supp. 384] supra, the state policy is neutral. See, e.g. *Kirksey v. City of Jackson,* 461 F.Supp. 1282, 1291 (S.D.Miss. 1978) (There is lacking herein sufficient interest in at-large districting to allow a finding that there is an extant state policy in favor of at-large districting of city government).

469 F.Supp. 1150 at 1172. It is to be noted that the general state statute which applies to counties, for which no local act is in force, does provide for at-large election. Section 1 of Chapter 3 of Title 11 of the Code of Alabama of 1975.

28. The Complaint was filed in this Action On October 19, 1978; the School Board's Motions to Dismiss were denied on March 9, 1979; the Pretrial Order was submitted on November 16, 1979; the trial was commenced on November 26, 1979; and the Plaintiff completed the presentation of its evidence on March 12, 1980, at which time the School Board Defendants filed their Motions for Involuntary Dismissal. Although this action was litigated before the decisions of the United States Supreme Court in *City of Mobile, Ala. v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), *Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), it was filed and tried after the decisions in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), *Village of Arlington Heights v. Metropolitan Housing Development Corp.,* 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977), and *Nevett v. Sides,* 571 F.2d 209 (5th C.C.A., 1978). At all stages of this litigation, as well as in the Pretrial Order, all parties (including Plaintiff) recognized that proof of intentional discrimination was an essential element of the Plaintiff's claims. (See Paragraphs 4(b)23,

24, 25, 26, 27 and 28, Pretrial Order; Answer of School Board Defendants, Paragraph 10 of Seventh Defense; Second Response of Plaintiffs' to Motions to Dismiss served January 17, 1979, pp. 3–6 (discussing 42 U.S.C. 1971(a)(1)), pp. 7–9 (discussing 42 U.S.C. 1973), and pp. 10–12 (discussing the intent requirement as established in *Nevett v. Sides,* 571 F.2d 209 (5th C.C.A.) (1978)). It is apparent that the parties, as well as the Court, correctly anticipated how the intent requirement established in *Washington v. Davis* and *Arlington Heights* would be applied to this voting dilution case without the necessity for the Supreme Court's later opinions in *Bolden* and *Rogers.* (See *Lodge v. Buxton,* 639 F.2d 1358 (5th C.C.A., 1981), aff'd. *Rogers v. Lodge,* supra.). Thus counsel for Plaintiff's, in oral argument before the Court at the hearing held January 3, 1979, (This hearing has not been transcribed. See Second Response of Plaintiff's to Motions to Dismiss served January 17, 1979, pp. 10, 13–14.) and in written Brief served January 17, 1979 (See Second Response of Plaintiffs' Motions to Dismiss served January 17, 1979, pp. 10–12, wherein counsel for Plaintiff argue the intent requirement established by the Court of Appeals in *Nevett v. Sides,* supra.) acknowledged that a showing of intentional discrimination is required in voting dilution suits based on the 14th Amendment, but argued that the required intent could be established either by proof that the voting plan was enacted with a discriminatory motive, or by proof supporting an inference from circumstantial evidence under the *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973), *Nevett,* and *Kirksey,* criteria that such plan was maintained for a discriminatory purpose in Dallas County. In the Pretrial Order, the parties recognized as a contested issue of fact whether intentional and invidious racial discrimination was a motivating factor in the enactment and maintenance of the laws and procedures of the State of Alabama prescribing and governing the election of members of the Dallas County Commission and the Dallas County Board of Education. (Paragraphs

4(b)22, 23, 24, 25, 26, 27 and 28 of Pretrial Order). In the presentation of its case at trial, the Plaintiff attempted to prove those criteria set forth in *Zimmer, Nevett* and *Kirksey,* offering such evidence against all Defendants. The Plaintiff also attempted to prove that intentional and invidious racial discrimination was a motivating factor in the enactment and maintenance of the laws and procedures of the State of Alabama prescribing and governing the election of members of the Dallas County Commission. However, the Plaintiff—having admitted the constitutionality of Section 16–8–1 of the 1975 Code of Alabama and the at-large electoral system thereby prescribed—made a deliberate decision and offered no evidence to establish that intentional and invidious racial discrimination was a motivating factor in either the enactment or the maintenance of that state-wide Alabama law. (See Transcript, pp. 22–24). Thus Plaintiff attempted to prove its claims against the School Board Defendants merely by arguing and attempting to show that this state-wide law had been unconstitutionally applied in Dallas County in a manner different from that by which it has been applied in other counties. (See Transcript, pp. 22–24. The Plaintiff's Response to Defendants' Motions to Dismiss served December 4, 1978, pp. 1–3; Plaintiff's Second Response to Defendant's Motion to Dismiss served January 17, 1979, pp. 13–14). Plaintiff also attempted to prove a discriminatory purpose by inference from evidence offered under the *Zimmer* criteria to show that the impact or effect of this State law in Dallas County produced an unconstitutional result. (See Second Response of Plaintiff to Motions to Dismiss served January 17, 1979, pp. 10–12, wherein counsel for Plaintiff acknowledged in Brief: "The Court of Appeals for the Fifth Circuit has recently held that a showing of intentional discrimination is required in voting dilution suits based on the Fourteenth and Fifteenth Amendments. *Nevett v. Sides,* 571 F.2d 209 (5th C.C.A., 1978). The Court recognized that intent could be established in two ways. The first approach proves that the voting plan was enacted with a discriminatory motive while the second approach infers intent from circumstantial evidence...".)

29. The Plaintiff, at trial, offered evidence against all of the Defendants, including the Probate Judge and other members of the Dallas County Commission (hereinafter County) as well as the School Board Defendants. A large part of the testimony was offered against all of the Defendants—especially evidence relating to Plaintiff's claims of past discrimination in Dallas County and the alleged denial to blacks of equal access to the political process in Dallas County. However, a substantial amount of the evidence (especially that relating to the issue of responsiveness) related only to either the County or the School Board, but not both.

30. As required by the Order and local Rules of this Court, the parties conferred prior to trial and marked and identified in the Pretrial Order all exhibits which they proposed to offer at trial (except exhibits to be used solely for the purpose of impeachment). There were substantial problems with this procedure, resulting primarily from the failure of Plaintiff's counsel to follow the Pretrial procedures imposed by this Court. (See Transcript, pp. 6–22, 24–26, 151–160, 163–167, 1265–1309, 1497–1509, and 1536–1556) Nevertheless, during the course of the trial proceedings (and with substantial involvement by the Court) the parties were finally able to reach agreement as to most of the exhibits. Exhibits marked for identification as Government Exhibits 15, 17, 18–A, 18–B, 18–C, 19, 21, 22, 30, 39, 40, 41, 48, and 51 were withdrawn by Plaintiff, and were neither received nor considered by the Court. Government Exhibits No. 5, 5–A, 6–B–1, 6–B–2, 6–B–3, 13–A, 13–B, 14, 16, 20, and 49 were offered and received only against the County, but not the School Board. Exhibits 1, 2, 3, 4, 6–A–1, 6–A–2, 6–A–3, 8–A, 8–B, 9, 11, 47, 52–A, 140, 141, and 53–139 related primarily to census, highways, demographic, and election information, and these exhibits were received and considered against the School Board as well as the County. Exhibits No.

10, 23, 27, 28 and 50 consisted of cases, statutes, or other laws of which this Court may take judicial notice, but which were nonetheless marked and received in evidence. Exhibits 10, 11, 12, 23, 24, 25, 26, 27, 28, 29, 31, 32, 33, 34, 35, 36, 37, 38, 42, 43, 44, 45, 46, and 50 consisted of a mass of historical documents, official reports, cases, laws, and constitutional proceedings (including those of which this Court may take judicial notice), all of which were offered by Plaintiff in an effort to prove past discrimination or its effect, or an alleged denial to blacks of equal access to the political process, or an alleged lack of responsiveness on the part of the School Board. Exhibits 7 and 32 were marked for identification, but were not received in evidence by the Court. The Court has carefully weighed, considered, and evaluated each and all of those exhibits which have been admitted in evidence against the Defendants, and has considered their probative value, weight, and significance in making and rendering these Findings of Fact.

31. The Plaintiff called a number of witnesses in the presentation of its case against the Defendants. The testimony of a number of these witnesses related primarily to the *Zimmer* issues (as more fully set forth in the Pretrial Order) of whether blacks have equal access to the political process in Dallas County, and whether past discrimination has any present effect in discouraging participation by blacks in the political process in Dallas County. Such testimony was, of course, directed against all Defendants. On those issues the Court considered the testimony of Mr. Harold J. Avinger, Rev. F. D. Reese, Mrs. Marie Foster, Rev. Fairro Brown, Mr. Samson Crum, Mr. Edwin L. Moss, Mr. Gerald O. Harvin, Mr. J. C. Davis, Sr., Mr. Cleophus Hobbs, Mrs. Ethel Lena Dixon, Mrs. Esther Snyder, Rev. Seaborn Powell, Mr. J. L. Chestnut, Jr., Mr. Percy Harrell, Mr. Joseph Pettway, Mr. Joseph Sappey, Mrs. Joyce McBride, Dr. Charles Cottrell (including his deposition admitted in evidence). Many of the foregoing witnesses also testified at considerable length with respect to Plaintiff's claims that the Court was unresponsive to the needs of blacks. Much of this testimony

related to the location and condition of county roads within the Dallas County road system, and none of this testimony was directed against the School Board defendants.

32. At the conclusion of Plaintiff's case, the Court took under advisement the Motions for Involuntary Judgment filed by the defendants and directed the County to proceed with the presentation of its testimony. (See Transcript, p. 1715) The County then called as an expert witness Dr. James E. Voyles, who testified at length with respect to those issues which had been covered by Dr. Cottrell. (Transcript, pp. 1716–1911) The County also called as witnesses Mr. B. A. Riddle, Mr. Ray Bass, Mr. Terry Benton, Mrs. Pauline Bryant, Mrs. Catherine Revel, Dr. Clyde R. Walker, Mr. Richard Ray, Mr. Cassidy Bender, Dr. Sam Waldrop, Mr. Julian Lilienthal, Mr. Larry Lewis, Mr. Andrew Calhoun, Mr. Ralph Harris, Mr. John Cecil Campbell, Mr. W. H. Kendrick, Mr. Gene Norris, Mr. Malloy Chandler, Mr. C. Stanley Baldwin, Mr. Bernard A. Reynolds, Judge John W. Jones, Jr., Mr. L. Seawell Jones, Mr. Warren A. Rhoades and Mrs. Ruth Horne. The Plaintiff then called as expert witnesses Dr. Peyton McCrary, Dr. J. Morgan Kousser, and the County called as expert witnesses Dr. Allen W. Jones and Dr. William H. Stewart, Jr. None of the testimony offered by the County related to the issue of whether the School Board was responsive to the needs of blacks (as those issues were framed in the Pretrial Order), except for testimony by Mr. Andrew Calhoun (a former County Commissioner) that he had done work on schools and school facilities in Dallas County (See Transcript, pp. 2276–2281) and the testimony of Mr. B. A. Riddle concerning qualifications of black applicants for secretarial jobs.

33. Dallas County, Alabama, is located in central Alabama. It is bordered by Wilcox County to the south, Marengo County to the west, Perry and Chilton Counties to the north and west, Autauga County to the north and east, and Lowndes County to the east. Much of its population has remained fairly stable. For example, in 1970 there

were 55,296 residents, of whom 26,330 (47.6%) were white and 28,892 (52.3%) were black. (See Paragraph 4(a)22, Pretrial Order) On July 1, 1976, there were 56,200 residents, of whom 28,488 (50.62%) were white and 27,752 (49.38%) were black. (See Paragraph 4(a)24, Pretrial Order) Although the population remains substantially the same, there was a proportional increase in the white population by approximately 3%, with a corresponding proportionate decline in the black population. (See Paragraph 4(a)22 and 24, Pretrial Order) Furthermore, the white voting age population is proportionately higher than the total white population. (See Paragraph 4(a)23, Pretrial Order) For example, in 1970 whites comprised 53% of the voting age population and only 47.6% of the total population, while black comprised 47% of the voting age population and 52.3% of the total age population in 1976, the 1970 census figures (See Plaintiff's Exhibit 3 and Paragraphs 4(a)22 and 23, Pretrial Order) and other evidence all indicate that in July, 1976 whites comprised approximately 56% of the voting age population and 50.6% of the total population, while blacks comprised approximately 44% of the voting age population and approximately 49.4% of the total population. These figures are significant, when considered along with the figures showing voter registration by races. The following is a summary, by years, of the number and percentages of black and white registered voters in Dallas County: (See Plaintiff's Exhibit 2)

SUMMARY OF REGISTERED VOTERS

| YEAR | WHITE VOTERS | | BLACK VOTERS | | TOTALS |
|------|------|------|------|------|------|
| | NO. | % | NO. | % | |
| 1961 | 9,195 | 98.3 | 153 | 1.7 | 9,351 |
| 1962 | 8,597 | 97.3 | 242 | 2.7 | 8,839 |
| 1963 | 9,162 | 96.8 | 298 | 3.2 | 9,460 |
| 1964 | 9,542 | 96.6 | 335 | 3.4 | 9,877 |
| 1966 | 12,319 | 53.9 | 10,557 | 46.1 | 22,876 |
| 1968 | 13,301 | 55.4 | 10,717 | 44.6 | 24,018 |
| 1969 | 13,582 | 56.2 | 10,576 | 43.8 | 24,158 |
| 1970 | 15,071 | 56.7 | 11,480 | 43.3 | 25,497 |
| 1972 | 16,134 | 57.3 | 12,020 | 42.7 | 28,154 |
| 1974 | 16,158 | 55.9 | 12,761 | 44.1 | 28,919 |
| 1976 | 16,683 | 56.2 | 13,009 | 43.8 | 29,692 |
| 1977 | 16,774 | 56.2 | 13,059 | 43.8 | 29,833 |
| 1978 | 17,525 | 55.7 | 13,937 | 44.3 | 31,462 |

As can be seen from the above figures, both in 1970 and in 1976 the percentages of white and black registered voters were substantially the same as the percentages of white and black citizens of voting age. Thus in 1976 whites comprised approximately 56% of persons of voting age and 56.2% of registered voters, while blacks comprised approximately 44% of persons of voting age and 43.8% of registered voters. In 1970 whites comprised approximately 53% of the voting age population and 56.7% of the registered voters, while blacks comprised 47% of the voting age population and 43.3% of the registered voters. These figures are significant in determining whether there is now any lingering effect of past discrimination against blacks. Certainly, at least with respect to voter registration, there is no such present effect. The Court finds that the percentages of blacks and whites of voting age who have registered to vote is now substantially equal, and that past discrimination has no effect on black voter registration.

34. The early history of Alabama, and Dallas County in particular, has demonstrated discrimination against blacks in all fields. This discrimination has been intentional, subtle, and pervasive, and has been achieved through legal means resulting from economic considerations. (See Plaintiff's Exhibits 11, 12, 23, 24, 25, 26, 27, 28, 29, 33, 44, 45 and 50. Also see this Court's opinion in *Clark v. Marengo County*, 469 F.Supp. 1150, at 1172–1173, D.C.S.D.Ala. 1979) The practical effect of the 1901 Constitution was to put a legal gloss on the disenfranchisement of black voters. Indeed, the 1901 Constitutional Convention was called for that purpose, among others. Having been effectively disenfranchised before 1901, blacks were generally unable to participate meaningfully in political affairs in Alabama until passage of the 1965 Voting Rights Act. Before then, many legal devices were employed to prevent or hinder blacks from voting, including such requirements for registration as a literacy test, a poll tax, and a voucher of good character from a registered voter. (See Paragraph 4(a)19, Pretrial Order) At least until 1954, there was what has grown to be known as *de jure* segregation in Alabama. Before

1965 there were few gains made by blacks—and those few were achieved primarily through litigation in the Federal courts. Literacy tests, which had served as a tool to discriminate against black voting applicants, were invalidated in 1949. *Davis v. Schnell,* 81 F.Supp. 872 (S.D.Ala.1949). Racial gerrymandering of districts for elections was outlawed on two separate occasions. *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Sims v. Baggett,* 247 F.Supp. 96 (M.D.Ala.1965). There have been many other cases, unrelated to voting rights, in which Alabama blacks have sought recourse in the Federal courts to protect their constitutional rights in areas such as employment, housing discrimination and criminal proceedings. See *Smith v. Allwright,* 321 U.S. 649, 64 S.Ct. 757, 88 L.Ed. 987 (1944); *Wilkins v. United States,* 376 F.2d 552 (5th C.C.A., 1967); *Thomas v. United States,* 376 F.2d 564 (5th C.C.A., 1967); *Sims v. Amos,* 336 F.Supp. 924 (M.D.Ala., 1972); *Harper v. Vance,* 342 F.Supp. 136 (N.D.Ala., 1972); *Strain v. Philpott,* 331 F.Supp. 836 (M.D.Ala., 1971); *United States v. Alabama,* 252 F.Supp. 95 (M.D.Ala., 1966); *Williams v. Wallace,* 240 F.Supp. 100 (M.D.Ala., 1965); and *United States v. Alabama,* 192 F.Supp. 677 (M.D. Ala., 1961). There were also a number of cases involving Dallas County, in which blacks were required to seek recourse in federal courts to protect their voting rights and other constitutional rights. See *U. S. v. Atkins,* 323 F.2d 733 (5th C.C.A., 1963); *U. S. v. Clark,* 249 F.Supp. 720 (S.D.Ala., 1965); *Clark v. Boynton,* 362 F.2d 992 (5th C.C.A., 1966); *U. S. v. Executive Comm. of Dem. Party of Dallas County, Ala.,* 254 F.Supp. 537 (S.D.Ala., 1966); *U. S. v. McLeod,* 385 F.2d 734 (5th C.C.A., 1967). The impact of these state laws is best evidenced by the above voter registration statistics, which reflect that in 1964 there were only 335 black registered voters in Dallas County, representing only 3.4% of the total registered voters at that time. (See Plaintiff's Exhibit 2)

35. Since 1965, there have been substantial changes in Dallas County as well as throughout the State of Alabama. The Voting Rights Act of 1965 brought sweeping changes to Alabama and Dallas County, and removed many of the legal impediments which had previously prevented or hindered blacks from exercising their voting rights. (See, e.g. Plaintiff's Exhibits 12 and 45) In 1966 the prior state requirements of a literacy test, a poll tax and a voucher of good character from a registered voter were all eliminated as a condition to registration. Federal voting registrars were appointed and used in many Alabama counties, including Dallas County, and these federal registrars registered substantial numbers of black voters. (See Plaintiff's Exhibits 11, 12, and 45) For example, a 1969 report by the Justice Department reflected that in Alabama federal registrars had registered a total of 66,539 voters, of whom 61,239 (92%) were black and 5,300 (8%) were white. In Dallas County most of these newly enfranchised black citizens were registered before 1966, with the result that by 1966 the number of registered black voters in Dallas County had increased to 10,557 (from only 335 in 1964), comprising at that time approximately 46.1% of the total number of registered voters in Dallas County. (See Plaintiff's Exhibit 2)

36. Plaintiff offered a substantial amount of evidence relating to the activities of the Dallas County Board of Registrars. The thrust of Plaintiff's evidence was that the Board of Registrars meets only at times inconvenient to black and white citizens who wish to register, and that some blacks have been discouraged from registration because the board meets at the Dallas County Court House. (See, e.g., testimony of Rev. F. D. Reese, Transcript, pp. 119–290; testimony of Edwin L. Moss, Transcript, pp. 681–758 at 739; testimony of J. L. Chestnut, Jr., Transcript, pp. 1046–1181; Mrs. Marie Foster, Transcript, pp. 290–430; Mrs. Ethelena Dixon, Transcript, pp. 911–930; and Mr. Samson Crum, Transcript, pp. 468–680). Plaintiff also challenged the recent decision of the Board of Registrars not to appoint deputy registrars to assist in registering voters. Since 1978 the Board of Registrars has been em-

powered to appoint deputy registrars, but has not done so. See Section 17–4–158, 1975 Code of Alabama. This evidence was offered by Plaintiff in support of its contention that blacks lack equal access to the election system in Dallas County. Plaintiff's evidence relating to the Board of Registrars clearly fails to establish any lack of access by blacks to the registration and election process, and the evidence preponderates against Plaintiff on that issue. The courthouse is the seat of county government, and is therefore a proper and appropriate place for the Board of Registrars to conduct its activities. The evidence clearly shows that the Board has met frequently, and has been accessible to all citizens (both black and white) who desire to register. (See, e.g., testimony of Mrs. Marie Foster, Transcript, pp. 290–430; Edwin L. Moss, Transcript, pp. 681–758; and Rev. F. D. Reese, Transcript, pp. 119–20 at 217) On the basis of the evidence offered, this Court is unable to find any fault with the Board's decision as to appropriate office hours. The Board will never be able to please all citizens with its office hours, but the Court finds that there has been no evidence of discrimination or discriminatory purpose in setting office hours. The office hours certainly have not been unreasonable, and any resulting inconvenience has affected black and white citizens in equal measure. Furthermore, prior to April 27, 1978, the Board was required by state law to visit each precinct at least once (and more often if necessary) between October 1, and December 31 every other year; to remain in each such precinct at least a half day; and to give at least twenty days notice of the time and place, in each precinct, where voter registration could be accomplished. Section 17–4–1, 1975 Code of Alabama. That law was repealed effective April 27, 1978, and was superseded by another law permitting the Board to meet a maximum of 120 session days each year, with the actual number to be determined by a quorum of the Board according to the needs of the County. Section 17–4–156, 1975 Code of Alabama. (Transcript, p. 3198) That 1978 law specifically required at least one member of the Board to be in attendance at the Dallas County Courthouse on any day on which the full Board does not meet and the Court House is open for business, excepting Saturday, to receive applications, administer oaths, and perform clerical duties of the Board. Section 17–4–156(a). The Board was further authorized to use as many as 25 session days for special registration sessions away from the Courthouse and out in the several precincts of the County, with provision for proper notice. Section 17–4–156(f). There has been no evidence that the Board has failed to follow any of these statutory requirements and procedures, either before or after 1978. (See, testimony of Rev. F. D. Reese, Transcript, pp. 119–290; testimony of Edwin L. Moss, Transcript, pp. 681–758; testimony of J. L. Chestnut, Jr., Transcript, pp. 1046–1181; Mrs. Marie Foster, Transcript, pp. 290–430; Mrs. Ethelena Dixon, Transcript, pp. 911–930; and Mr. Samson Crum, Transcript, pp. 468–680; Transcript, pp. 3201–3204, 3208–3209, 3210–3212) Instead, Plaintiff's evidence showed only that the Board has been authorized since April 27, 1978, to appoint deputy registrars (Section 17–4–158), and that it has not done so despite the requests and wishes of a number of black leaders. The appointment of deputy registrars is clearly discretionary with the Board of Registrars, and Plaintiff offered no evidence as to the Board's reasons for declining to do so. Neither was there any evidence showing an actual need for deputy registrars, although certainly there is a perceived need for such appointments by leaders of the black community. Notwithstanding such perceived need, the Court finds that the Board of Registrars has provided all black citizens with equal access to voter registration procedures; (Transcript, pp. 119–290, 681–758, 1046–1181, 290–430, 911–930, 468–680, 3201–3203, 3208–3219) that there is no disparity between whites and blacks with respect to access to the registration process (Id., 3241–3242) that the percentage of black voters is substantially the same as the percentage of black citizens of voting age (See Plaintiff's Exhibits 2 and 3, and Paragraphs 4(a)22, 23 and 24 of Pretrial Order); and that regis-

tration procedures have been applied by the Board fairly, equally and without discrimination or discriminatory purpose against blacks (Transcript, pp. 3190–3219, 217). Indeed the record reflects that the Dallas County Commission granted all requests by the Board of Registrars for additional days (Transcript, pp. 2860, 3198–3199). The Court therefore finds and concludes that the voter registration procedures followed in Dallas County do not discriminate against blacks nor constitute a denial to blacks of equal access to the voting rolls or the election system in Dallas County.

### 37. RESPONSIVENESS

#### 37a. ROADS

A major responsibility of the governing body of Dallas County relates to roads and highways. This fact is recognized by some of the Plaintiff's witnesses (Transcript, pp. 703, 765, 1323, 474 and 476).

Former County Engineer B. A. Riddle testified that about half of the County budget went to the Roads Department (Transcript, p. 1917), and that in later years the County Commission made substantial appropriations out of general revenue sharing funds (Transcript, p. 1918); that the County Commission appropriated adequate funds to the Road Department to maintain safe roads and enable construction programs (Transcript, pp. 1948, 2089 and 2091); that the Dallas County Commission was active in seeking federal and state highway funding (Transcript, pp. 1919–1925, 1958, 1963 and 1970–1971), this latter was confirmed by the testimony of his successor, (Transcript, p. 2084). From his testimony and that of his successor's, it is obvious that Dallas County maintained an extensive Road Engineering Department (Transcript, pp. 1925–1926, 1929–1930, 2081).

Dallas County has about 1000 miles of roads it maintains, with about 285 of same being paved and about 715 being unpaved (Transcript, p. 2104). The total road mileage is higher than that of more populated Montgomery County (Transcript, p. 1113).

Witness Riddle testified that, with extensive knowledge of the road systems in Ala-bama (Transcript, p. 1916) the Dallas County road system would rank in the top six of the sixty-seven counties in Alabama (Transcript, pp. 1925, 1933 and 1940); that when he took over as County Engineer in 1972 the county had a good overall network of roads with a policy of expanding the overall number of paved roads each year (Transcript, pp. 1934, 1953–1954); with a very adequate system of paved roads (Transcript, pp. 1936–1939) designed to compliment the state paved road system in the County (Transcript, p. 1937). He further testified that the County maintained its paved roads to State Highway specification (Transcript, p. 1939); that the gravel connecting roads (non-one-way) were in very good condition (Transcript, pp. 1940–1941, and 2048–2049). His testimony reveals that roads in the Dallas County system face the typical problems of use (Transcript, pp. 1941–1942, see also 2096–2097 and 2406–2407), flooding and high water (Transcript, pp. 1942–1944 and 2097–2098), freezing and thawing (Transcript, p. 1944), and rain (Transcript, p. 1945). Testimony of some of the Plaintiff's witnesses reveals an awareness of the problems of weather and the elements on gravel roads (Transcript, pp. 1032–1033 and 509).

Mr. Riddle's successor as County Engineer, Mr. Ray D. Bass, was a former Director of the Alabama State Highway Department, which is a cabinet level position in Alabama (Transcript, pp. 2079–2080), who had also served as a County Engineer for a total of ten years in Lowndes and Montgomery counties in Alabama from 1960–1970 (Transcript, p. 2079). Mr. Bass testified that he had extensive knowledge as to the conditions of county road systems across the State of Alabama (Transcript, pp. 2082, 2084, see 2103 re: Dallas County). His testimony confirms that of B. A. Riddle as to the condition of the Dallas County road system, and he testified that the Dallas County roads are above-average as compared to other counties, with the unpaved roads being in much better shape than other counties (Transcript, p. 2083). He cited lack of funding regarding what resurfacing need there exists regarding the paved roads (Transcript, p. 2082).

Mr. Riddle's testimony further reveals that annual inspections by the Alabama State Highway Department gave Dallas County roads better than average grades (Transcript, pp. 1948, see also 2084–2085 and 2919–2920); that presently road fund revenues are declining in Alabama (Transcript, p. 1949) and the cost of road construction is substantially increasing (Transcript, pp. 1949–1951).

While much testimony relating to roads is perhaps necessarily related to the more recent past because of the fading human memories and the availability of witnesses, the County Commission has presented testimony of a long-time county road department employee that back in the 1930s the County was conducting general road work in areas where both black and white people lived (Transcript, pp. 2399–2403). His testimony reveals that the County has not been discriminatory against black residents concerning road maintenance work (Transcript, pp. 2417–2471).

Another major road-related factor in Dallas County is bridges. County Engineer Ray Bass testified that Dallas County had around 180 bridges with about 60% being in some respect deficient (Transcript, pp. 2094–2095), with availability of funds hampering implementation (Transcript, p. 2095). His testimony reveals that the criteria for bridge work is based on engineering and structural sufficiency (Transcript, p. 2095). The testimony reflects some effort on the County's part to work on the bridge problem (Transcript, pp. 2093–2094, 3021–3023). From the testimony the Court does not find any discrimination against black residents and citizens regarding the county's bridge policies and work.

The testimony of County Engineer Ray Bass also dealt with the recent county construction projects (Transcript, pp. 2092–2094). From various witnesses' testimony about these projects the Court finds that these recent projects have not been lacking in effect on black residents and road users nor have they exhibited any discrimination toward black residents or citizens in provisions of road services.

Some of the testimony concerning roads dealt with subdivision situations. Dallas County has a subdivision policy, under which a developer is supposed to bear the expense and work of basing and constructing the roads in the subdivision up to county standards (Transcript, pp. 1982–1987 and 1999–2001). The county has on a number of occasions gone in and done road maintenance work on subdivision roads when the developer did not comply with the county's subdivision policy (Transcript, pp. 1985–1986). From the examples of these digressions from policy in the record, it appears that black residential areas have not been discriminated against (Transcript, pp. 2010–2012, 2056–2059, 1999, 2602, 2610–2612).

The Plaintiff introduced testimony concerning the streets in several black residential areas in the unincorporated community of Selmont just south of the Alabama River from the City of Selma. In the case of *Selmont Improvement Association v. Dallas County Commission,* reported at 339 F.Supp. 477 (S.D.Ala.1972) the court has reviewed the court file in that case and finds no action indicating any failure on the part of the defendants county commission to follow the orders of the Court (Transcript, pp. 2245, 519–522); in fact, the Court finds that under stipulation of counsel in that case the same is due to be dismissed. The residential areas involved in the Selmont street suit were another example of subdivision problems, i.e. development without proper road construction and in this case right-of-way (Transcript, pp. 1972–1976, at 1975). The thrust of the Plaintiff's testimony was that the county had not lived up to its obligations under the decree (Transcript, pp. 519–523); yet the government's witnesses testimony and the County Engineer's testimony (Transcript, pp. 1972–1976) refute the Plaintiff's allegation and the same is not supported in the Court file in that case.

The testimony reveals that the County Commission has done roadwork for the predominantly black public school system of the County (Transcript, pp. 2460–2461, 2465–2466, 2249, 2276–2281); further that

the County Commission made large appropriations to the City of Selma to enable paving of gravel streets in predominantly black neighborhoods in the eastern part of the City (Transcript, pp. 2903–2913) and maintains several farm to market roads which are paved streets in Selma (Transcript, pp. 2908–2912).

The present members of the County Commission all testified for the Defense. Three of the four Commission members have charge of a road maintenance crew. From the testimony of each of these commissioners it is clear that these maintenance crews do perform routine work on the county gravel roads (Transcript, pp. 2512–2513, 2549, 2590–2591, 2639–2940 and 2944–2945), and this testimony is supported by that of the two road crew foremen who testified (Transcript, pp. 2346–2347, 2404–2406). Their testimony reveals that, generally, the minor requests for roadwork are filled (Transcript, pp. 2638–2639, 2589, 2512).

While the Plaintiff attempted to show that black citizens tend to live on unpaved and fringe roads and tend to live in predominantly black areas, the Court finds that while there are black neighborhoods, generally blacks live scattered across most of the County. Even had the Court concluded as the Plaintiff desired, that would not indicate unresponsiveness on the part of the County governing body without other factors combining to show a discrimination in provision of road services.

The County road crews provide turnouts to enable access off the public roads (Transcript, pp. 1977–1978), and there is no testimony that the commission discriminates against blacks in that regard, but to the contrary that the county provides same on a request basis (Transcript, pp. 2299, 2420–2421 and 2645).

The testimony reveals that the county road crews do react to weather conditions in the nature of storms and floods and that this meets a need of parts of the black community of the county (Transcript, pp. 3027, 3153).

The County Commission has a policy of utilizing school bus routes and mail routes and connecting roads for paving projects and in trying to distribute such paving around the county (Transcript, pp. 1989, 2091–2092, 2108) with traffic counts and usage being utilized on paving projects with State funding (Transcript, pp. 1992, 2091).

The Dallas County Engineer attends the Commission's meetings, which are open (Transcript, pp. 2001–2002, 2099) and investigates road and drainage requests and complaints (Transcript, pp. 2002–2003 and 2099–2100), and is subject to general contact by citizens (Transcript, pp. 2004, 2100–2101).

The testimony reveals that present County Commissioner W. H. Kendrick, who defeated a long-time incumbent, held a public meeting at Orrville in west Dallas County concerning road policy which was attended by black constituents (Transcript, p. 2526), the purpose of the meeting being to identify roads in the West Maintenance District that the county would maintain (Transcript, pp. 2527–2528); subsequently he held additional meetings one of which was attended by the State Legislator who represented the area (Transcript, p. 2528) at which the road policy situation in Dallas County was discussed (Transcript, p. 2529); further subsequent meetings with the Governor of Alabama at the State Capitol (Transcript, p. 2529).

The concerns that Commissioner Kendrick expressed relate to concern for the private-work problem that exists regarding roads in Alabama. Work on private property by county crews is prohibited in Alabama. See Alabama Code 11–3–10, 23–1–80, and 23–1–130. The testimony does reveal instances where the County Commission has stretched the law to help black citizens (Transcript, pp. 2479–2481, 2499–2502, 2711–2713 and 2721–2723). Further example of this relates to road work done by county crews at churches (Transcript, pp. 2467–2468, and 2656–2657) and special circumstance cases (Transcript, pp. 2531–2533, 2421–2423, 2721–2722, 2748, 2274–2275 and 2283–2284). The Court does not find that black residents or citizens have been discriminated against from the examples given in

the testimony; if any conclusion was reached it would be that they have benefited from these digressions from policy and law. The question of what is a public road which the County Commission can maintain and improve and pave and what is a private road concerning which they are prohibited by law from doing work on is familiar to the Court; further the Court is not unfamiliar with gravel roads in west central Alabama. The Court finds some problem with the testimony of the Plaintiff's witnesses regarding certain particular roads as it is not clear whether the roads being testified about are public or private. The Plaintiff called ten witnesses (Fairro Brown, Samson Crum, Gerald Harvin, J. C. Davis, Cleophus Hobbs, Ethelena Dixon, Esther Snyder, Seaborn Powell, Percy Harrell and Joseph Pettway) for testimony concerning roads. Their testimony related to road conditions in general and to the conditions of particular roads.

Additionally the testimony of the Defendants' witnesses shows the responsiveness of the Dallas County Commission to the needs of blacks for roadwork. First in this regard, it is obvious from the testimony of the Government witnesses that the members of the County Commission are available to black constituents in Dallas County respecting their road problems, both in meetings (Transcript, pp. 914, 924–925, 494, 808–809 and 923–924) and generally (Transcript, pp. 767–768, 898–899, 925–927, 1204–1206 and 1348–1349). Also, the testimony of the Government's witnesses reveals response by the County Commission to the requests or problems which blacks had regarding roads (Transcript, pp. 896–898). (See defense testimony in this regard Transcript, pp. 2239, 2509, 2586–2588, 2635–2636, 2854–2856, 2955–2958).

The evidence reveals that while some of the unpaved roads in predominately black areas do suffer in inclement weather and from use, the commissioners maintain the county roads on a non-discriminatory basis. Both road paving and graveling are conducted in areas predominately black and white and in mixed areas. The most serious road problems or deficiencies in unpaved roads appear to result from weather conditions, flooding or usage. The evidence fails to establish or reveal any occasion on which the County Commission has failed or refused to do normal maintenance work on the basis of the race of the people who request the work or who would benefit therefrom, nor does it reveal that complaints regarding roads in predominantly white areas received any greater concern than those in predominantly black areas.

### 37b. DRAINAGE

Another particularized need of the black community is that of drainage. This is recognized in the Plaintiff's testimony from witness Samson Crum (Transcript, p. 484). The testimony reveals that the County Commission has sponsored, applied for and received two large federally funded appropriations enabling three different drainage canals, with two being in the unincorporated community of Selmont and the third in the Beloit Community west of Selma, being in predominantly black populated areas. (Transcript, pp. 2246–2249, 2309–2310, 1990–1991, 566–567, 2614–2615, 3154–3155, 2982–2983, 2992–2993). The success of the Selmont canals is verified by Plaintiff's witness Crum (Transcript, pp. 511–512). Also, the County provided funding to the City of Selma which enabled construction of a drainage canal affecting a predominantly black residential area in Selma (Transcript, pp. 3127–3131).

### 37c. WATER & SEWAGE

The testimony further reveals that the County Commission has encouraged and helped enable water service to various parts of the county which contain large numbers of black residents. The first such rural water system organized in the county was in Selmont and the bonds financing the system were and are guaranteed by the County (Transcript, pp. 2874, 2876, 2139–2144) and the County Commission has provided some funding (Transcript, p. 2878). Subsequently the County appropriated funds to another water authority started on the initiative of a group of citizens (Transcript, p. 2878). A third rural water author-

ity was set up south of the Alabama River, being the South Dallas Water & Fire Protection Authority. Although the system has not begun construction, it does have commitments from the Dallas County Water and Fire Protection Authority to purchase water. (Transcript, pp. 2618–2630, see 2626). The coverage area of that Authority is predominantly black in population (Transcript, p. 2627). A fourth rural water authority was created in connection with a major water system project for the Beloit Five-Points area (Transcript pp. 3012–3015, 3157) being known as the West Dallas County Water & Fire Protection Authority. The coverage area of that authority is predominantly black in population (Transcript, p. 3014).

The County Commission sponsored, applied for and received a major sewage project for the Selmont Area (Transcript, pp. 2981–2982, 3154–3155, 2249–2250, 3070–3071). Sewage project in Selmont was a particularized need of the black community (Transcript, p. 484). The sewage project is a major public works project and is funded principally by two federal agencies by grants to Dallas County (Transcript, p. 2981).

### 37d. HOUSING

The Selmont sewage project involved funding for housing revitalization, and of the 75 homes affected by grants all but two were black residences, and of the 5 houses affected by loans, 3 were to white and two to blacks (Transcript, p. 3155). Additionally, the Beloit, Five-Points project has funding for housing revitalization (Transcript, pp. 3015–3018) and substandard housing is a problem of black residents in that area (Transcript, p. 3018).

### 37e. EMPLOYMENT

Another particularized need of the black community in Dallas County is for employment (Transcript, pp. 717, 2886). The County Commission has in several ways attempted to affect the problem of employment in the County. The testimony reveals that the Commission has for many years been involved with the City of Selma government and the Chamber of Commerce in trying to attract and keep industry to and in the County (Transcript, pp. 2881–2894, 2973–2980, 732, 717). The Commission has provided ad valorem tax exemptions (Transcript, pp. 2881–2884) and participated in funding site preparation work for local industries (Transcript, pp. 2883–2886, 719, 201, 2250–2252). The Commission contracts with the Chamber of Commerce to enable the Chamber's industry seeking efforts (Transcript, pp. 718–719, 2887) and has generally been active in efforts to keep and attract industry (Transcript, pp. 2887–2889). The Commission played an active part for several decades to keep the United States Air Force training base at Craig Field south of the Alabama River (Transcript, pp. 720–721, 2888–2891), which provided the largest single payroll in the county employing a large number of black persons (Transcript, pp. 2891–2892). The County Commission purchased lands with the City to have available and develop as industrial parks (Transcript, pp. 717–718, 2892).

Subsequent to the closing of the air base at Craig Field, the County Commission joined with the City of Selma government to have created by the Legislature an industrial authority known as the Craig Field Airport and Industrial Authority (Transcript, pp. 2964–2966). The County has appropriated funds to the Authority (Transcript, p. 2967), worked with the Authority to attract industry (Transcript, pp. 716, 735, 721–722, 2973–2976), donated lands to the Authority (Transcript, pp. 2967–2968), and worked to enable better water service at the old base (Transcript, p. 2975).

The County Commission also sponsored, applied for and received a grant from the Economic Development Administration which enabled construction of a public works capital improvement in the nature of a new courthouse annex building (Transcript, pp. 2994–2995, 3156), and this employed 14 local people all of which were black and none of which went with the contractor to his next job (Transcript, p. 3156).

The County Commission actively participated in and sought comprehensive Employ-

ment Training Act funding (Transcript, pp. 3078, 3158–3168). The County Federal Programs Director testified that the county actively sought CETA funding for the county and the city (Transcript, pp. 3160–3161) and that the large majority of the persons hired and also of those hired permanently for the County were black (Transcript, pp. 3162–3165). The permanent employment rate for county CETA employees was good (Transcript, p. 3163), and the program had a substantial impact on the overall unemployment rate in Dallas County (Transcript, p. 3165). The County spread the CETA employees around to various departments and agencies and thereby aided those offices in providing services in the field of health (Transcript, pp. 3008–3009), education (Transcript, p. 3009), recreation (Transcript, p. 3006).

The Court has also considered the related inquiries as to employment by the County Commission and appointments made by it. The Court notes that the county employs some staff and its road department personnel. Given the structure of county government in Alabama, a number of courthouse employees are hired by other elected officials. The record reveals that during its participation in the Comprehensive Employment Training Act program the County hired predominately black persons through the local state employment office. (See Transcript, pp. 3006–3011) For other personnel there appear to be more blacks than whites in the county road department, with whites holding the few higher-level positions (Transcript, pp. 3080–3082, 2027–2045 and 2642–2643). The Court notes that the road foremen have been generally long-time employees (Transcript, pp. 2033, 2039, 2399, 2345) and further notes that the county has in some instances apparently not had qualified black applicants for jobs (Transcript, pp. 2041–2044). The County Equal Opportunity Officer is black (Transcript, p. 3112). The Court is aware through knowledge of its own records that the Dallas County Commission, together with other separately elected county officials are under an order of this Court regarding employment, being *Crum, et al. v. Dallas County,*

*Alabama, et al.,* Civil Action No. 7293–72–H. In that case the county consented to a decree which simply (1) provided for a one-time publication of notice by newspaper publication that a job criteria manual was on file at the Courthouse, and that the County had a non-discrimination policy in hiring and (2) that notice of future job vacancies would be posted on the Courthouse bulletin board. No trial or evidence was presented. The Court has examined the court file and finds that no actions have been lodged against the Dallas County Commission since the consent decree was rendered on November 8, 1972. The Court finds that the plaintiff has failed to show any discrimination in hiring by the Dallas County Commission.

Regarding appointments by the Dallas County Commission, the Court notes that the two appointments to fill vacancies on the Commission, which were created by the death of incumbent commissioners, went to white persons, one to the brother of a commissioner (Transcript, pp. 2631–2632) and one to another white politician who had once run for the office. (Transcript, pp. 2301–2303). The Plaintiff would have the Court find that there was no policy of the Commission to offer vacancy appointment to the family of the deceased commissioner. The record does not reflect this one way or the other.

The Plaintiff has presented a list of appointments appearing in the County Commission minutes (Plaintiff, Exhibit 14). If the list were exhaustive and complete it reveals that the County Commission has failed to appoint blacks to committees and boards in proportion to the extent that the Commission has "appointed" its own members, but the list is misleading as it is common practice for multi-member bodies to act by committee or place its members on committees or boards for oversight purposes. (See Transcript, pp. 3140, 2876) The Court notes from the record that a prominent black leader in the Selma-Dallas County community was appointed jointly by the Mayor of Selma and Judge of Probate to the Craig Field Airport and Industrial Au-

thority, which is a very important position, and that the County Commission gave its concurrence to the appointment under the state statute. (Transcript, pp. 3060, 528, 683) The Court also finds that blacks do serve on a number of county boards. (See Transcript, pp. 3012–3013, 3138–3145, 3120–3122, 3070, 3185 and Plaintiff's Exhibit 14) Judge Jones who is Chairman Ex-Officio of the Commission testified that, with the exception of one advisory board which is all black, all county boards are integrated. (Transcript, pp. 3121–3122) and the record reveals that blacks have been considered for appointments and declined to serve (Transcript, p. 3109) and asked for appointment and been appointed (Transcript, pp. 2637–2638). While the Dallas County Commission may not have appointed as many blacks as it could to boards and committees, the Court does not read the evidence that the Commission has been unresponsive to blacks in such appointments.

The County has long participated in the Coosa-Alabama River Improvement Association and the Regional planning commission (Transcript, pp. 2879–2894, 3027). County efforts have also affected transportation in the County (Transcript, p. 2898), bus service in the City of Selma (Transcript, pp. 3023–3024) and transportation of elderly in the County.

All of the Commission's efforts in trying to keep and attract industry and provide job opportunity exhibit considerable responsiveness toward meeting the particularized needs of black citizens for jobs (Transcript, pp. 732, 735, 2893–2894, 896).

### 37f. HEALTH

The testimony reveals extensive efforts over a number of years by the County Commission to affect health-related problems, and many of these efforts have addressed particularized needs of the black citizens of the county. These efforts include annual and special appropriations and site preparation and personnel work for the regional comprehensive mental health center (Transcript, pp. 2167–2171, 2171, 2980, 2913–2916) which serves a predominantly black clientele (Transcript, pp. 2913–2916) with the

provision of a range of comprehensive mental health services (Transcript, p. 2161); aid to the tuberculosis efforts (Transcript, pp. 2902–2903); road work for local hospitals (Transcript, pp. 3126–3127), provision of a mosquito control program (Transcript, pp. 3020, 2213), generous annual and special appropriations to the county health department, the vast majority of whose clientele is black (Transcript, pp. 2204–2218). The County aids nutrition efforts (Transcript, p. 3021) and has participated in the food stamp program from the time of the predecessor commodities program (Transcript, pp. 2133, 2145–2153, 3019, 2895–2896).

### 37g. EDUCATION

County Commission assistance to education efforts is revealed through the testimony of various witnesses, and the same includes site work at the city public school system in Selma (Transcript, pp. 2872–2874), appropriation of funds to enable purchase of school buses for the county public school system (Transcript, p. 2873), site work at the predominantly black private Selma University (Transcript, pp. 2870–2871, 2909) and at the Lutheran School which serves a predominantly black student body (Transcript, pp. 2871–2872); aid to the Head Start program (Transcript, p. 2896), road work and site work at many of the county public schools (Transcript, pp. 2249, 2512–2513, 2515, 2590–2591, 2639–2640, 2644–2645) and modern office facilities for the Board of Education (Transcript, pp. 2873–2874); final appropriation to the Economic Opportunity Program (Transcript, pp. 2896–2897, 3024) and a one-time $30,-000.00 appropriation plus site preparation for a new building to house the food stamp offices, Head Start and EOP and other similar agencies (Transcript, p. 2895), financial assistance to a reading program known as RIF (Reading Is Fundamental) sponsored by a black sorority (Transcript, pp. 2900–2901, 2999, 3082–3084). The County provides extensive aid to the public library used extensively by blacks (Transcript, pp. 2908, 3137) including annual appropriations (Transcript, pp. 2904–2908, 3136–3137), purchase of a book mobile (Transcript, p. 3135),

appropriation of $400,000.00 to the City of Selma, to enable construction of a new library building (Transcript, p. 3133), provision of CETA employees (Transcript, p. 3009). This public library provides numerous services on a non-discriminatory basis to black citizens (Transcript, p. 3137), including a traveling book mobile with a Jr. College teacher for GED services (Transcript, pp. 3133–3134), branch library services in addition to the main library (Transcript, pp. 3134–3135); services to the public schools (Transcript, p. 3134) and training programs for public school libraries (Transcript, p. 3135); services to area nursing homes centers (Transcript, p. 3135); appropriations to help enable land acquisition for and sewage lines to a state trade school which is now a junior college (Transcript, pp. 3131–3132); provision of recreation sites to two county public schools (Transcript, p. 3004); provision of funding assistance and site preparation for the West Central Alabama Rehabilitation Center (Transcript, pp. 2232–2237), over half of whose clientele is black.

### 37h. WELFARE

The County Commission has supported the food stamp program in Dallas County since the days of the old commodities program (Transcript, pp. 2145–2153, 2133, 2895–2896, 3019) which provides large sums of assistance to a clientele over 95% black (Transcript, pp. 2149–2150).

Additionally the County Commission provides assistance to the local office of the state welfare agency (Transcript, pp. 2131–2137, 3025).

### 37i. RECREATION

The Dallas County Commission has provided or enabled a number of recreational facilities or programs benefitting the black citizens of the county. Through its participation in the Alabama-Tombigbee Regional Commission the County provides two Senior citizens centers, both in predominantly black residential areas (Transcript, pp. 2996–2997) and these were in response to requests from the black community (Transcript, pp. 2997–2998). The County also has provided for several years a recreation program for rural youth and this program

serves a predominantly black clientele (Transcript, pp. 2998–3002). Additionally the County sought and received federal funding to enable six recreational parks and they all serve black citizens, most almost exclusively (Transcript, pp. 3158, 3002–3005), including the Beloit area, the Tipton school in Selmont, at Sardis, and site at the Dallas County Colored 4–H organization location (Transcript, pp. 3002–3003, 3076). Two of these locations are at county public schools (Transcript, p. 3004). Additionally the County provides through its County Recreation Board funding to the black Young Men's Christian Association (Transcript, pp. 3019–3020); appropriation to the Dallas County Colored 4–H organization (Transcript, pp. 2916–2917).

### 37j. GENERAL

The County Commission has provided a modern jail facility to serve an inmate population which is consistently majority black (Transcript, pp. 2860–2864). At the jail there is a separate juvenile facility serviced by the Central Alabama Youth Service which provides, in addition to detention services, foster homes, group homes and court related services (Transcript, pp. 2180–2187, 2864, 2867–2868). The County's support for the CAYS organization has been from its inception (p. 2133).

The Commission has provided office space to a number of general state and federal service agencies (Transcript, pp. 2898–2906, 3027).

The Commission appears to have a consistent participation in flood, bad weather and disaster situations which work benefits black residents of the county (Transcript, pp. 2868–2870, 3027).

The testimony reveals that the County Commission makes itself accessible to all persons. The Commission meets regularly twice each month at the courthouse at Selma and sometimes meets in called sessions. These meetings are open to the public and are and have been for many years attended by all of the local press media and by the Montgomery *Advertiser.* (Transcript, pp. 2955, 2853–2855, 2238, 2955, 2635, 2587,

2509–2510, 2001–2002, 2099–2101, 492–494, 923–925, 534–535, 723–724, 2955) The media reports on these Commission sessions. The Commission provides an open forum to any person who wishes to address it on any subject, regardless of whether the subject relates to county business and does not restrict those who appear as to what they want to say. (Transcript, pp. 2956–2958, 2855–2856, 2238, 2635, 2587, 2510, 2101) There is thus available a regular press conference for the citizens. The commission also receives petitions from citizens. (Transcript, pp. 532–533) People and groups of people do appear frequently before the Commission at its meetings, and many of these are black persons. (Transcript, pp. 2957–2958, 2856–2859, 2239–2240, 2588–2589, 2510–2511)

The Commissioners and the Judge of Probate are all available for contact by citizens during the week at times other than official meetings and the evidence reveals that they are frequently contacted by black and white citizens and regularly meet with citizens about matters presented to them (Transcript, pp. 2958–2969, 2239–2240, 2856–2859, 2636–2639, 2588, 925–927, 535). The Commission makes its engineer and attorney available at its meetings (Transcript, pp. 2588, 2510, 2002, 2004) and at other times (Transcript, p. 536). Additionally the commissioners hold and attend other non-official Commission meetings at which citizen concerns are discussed (Transcript, pp. 916–917, 926, 1338–1340, 1250–1254, 2961–2966, 3057, 3104–3108, 2526–2529). The Court finds that the Dallas County Commission is fully accessible to the citizens and is responsive in making itself available for discussion of any matters about which citizens have concern, petition, grievance or requests.

In reviewing the several areas headed hereinabove such as drainage, sewage, housing, employment, health, education, welfare, recreation and general, the Court has carefully reviewed the large volume of testimony before the Court relating to same. The Court has further considered in each instance whether the assistance rendered by the County Commission was discretionary under Alabama law or mandated by State law; also whether the service involved affected a particularized need of the black community of Dallas County. The County Commission has actively sought and received literally many millions of dollars in federal funds to provide a wide range of services and public works projects. The extent of the services and the full litany of services and work provided by the county commission as reflected in the evidence is too voluminous to include for listing herein. From the testimony and evidence the Court finds that the Dallas County Commission has been very responsive to the needs and particularized needs of the black citizens of the county. The testimony and evidence reveal extensive efforts by the Dallas County governing body over a long period of time to provide for or enable a wide range of governmental services and facilities that benefit its citizens and these efforts have directly addressed and helped meet the needs of the black citizens of the County. The County governing body has been very progressive in its attitude and actions relating to the governmental services which affect the health, education, welfare, employment, housing conditions, travel and recreation of the county's citizens and from this attitude and these actions the blacks of the county have benefitted. While the various services or work in a number of instances affect or benefit white as well as black citizens, the black citizens of the county have fared well from the services and work provided, often receiving the greatest benefit.

38. Plaintiff's evidence attempted to show that prior to 1965 black citizens of Dallas County (and elsewhere in Alabama) were oppressed or intimidated by whites, and thereby discouraged from participating in the election process (Transcript, pp. 290–430, 468–680, 990–1046, 1310–1402, 119–290). Since few blacks were then registered (See Plaintiff's Exhibit 2), it is apparent that the purpose of that alleged intimidation would have been to discourage registration rather than voting. While the Court does not feel that the Plaintiff's testi-

mony establishes this intimidation, any such evils have been largely eliminated since passage of the Voting Rights Act of 1965 (See Findings of Fact 35, also Transcript, pp. 119–290, 681–758, 290–430, 1046–1181, 3190–3219, 3208–3209, 3216–3217, 3241–3242). Even the Plaintiff's testimony shows that at the present time black citizens of Dallas County register and vote freely, without intimidation or harassment by white citizens, and without *de jure* or *de facto* barriers to their participation in the election system. (See Findings of Fact 35, also Transcript, pp. 119–290, 681–758, 290–430, 1046–1181, 3190–3219, 3208–3209, 3216–3217, 3241–3242).

39. Since 1966 blacks have achieved substantial progress in Dallas County, and most—if not all—of the vestiges and lingering effects of past official discrimination have been eradicated. Blacks also achieved substantial equality with whites in voter registration (See Plaintiff's Exhibit 2, and Findings of Fact 33), as well as the opportunity to participate fully in the election processes in Dallas County. (See Findings of Fact 33, 35, and 36. Also Transcript, pp. 119–290, 681–758, 290–430, 1046–1181, 3210–3219). The Court is of the opinion and finds that official discrimination in Dallas County has now been eliminated within areas of government. The Court further finds that the vestiges and lingering effects of past discrimination in Dallas County have also been eliminated, and that any such past discrimination no longer precludes the present effective participation by blacks in the political affairs of Dallas County.

40. Since passage of the Voting Rights Act of 1965, black citizens of Dallas County have achieved full access to the process of slating candidates. All of the previous barriers to black participation in the political process have been eliminated in Dallas County. Thus blacks now freely and openly register, vote, run for office, serve as election officials, and participate in political campaigns without any legal or other barriers. (See Findings of Fact 33, 35, and 36. Also Transcript, pp. 119–290, 681–758, 290–430, 1046–1181, 3210–3219). Much of the success achieved by blacks in eliminating

the previous barriers to their full participation in the political process can be attributed to the high quality of black leadership in Dallas County. Even before 1965, many of the black leaders were openly encouraging black citizens to register and vote. Since then black citizens have become effectively organized in Dallas County, and have achieved remarkable success in their voter registration efforts. (Transcript, pp. 119–290, 681–758, 468–680, 290–430, 1046–1181, also Plaintiff's Exhibit 2 and Findings of Fact 33, 36, and 39). For example, an analysis of the 1970 census figures prepared by the United States Commission on Civil Rights in January, 1975, showed that in 1970 in the State of Alabama as a whole, black citizens lagged behind white in the percentages of voting age citizens who had actually registered. For the entire state of Alabama, the voting age population was 2,205,760 of whom 1,697,434 (77%) were white and 508,326 (23%) were black. However, of the 1,659,599 registered voters, 1,369,542 (82.5%) were white and only 290,057 (17.5%) were black. (See Plaintiff's Exhibit 45) In Dallas County, however, in 1970 blacks comprised approximately 47% of the voting age population and 43.3% of the registered voters. (See Plaintiff's Exhibit 2) These figures indicate that by 1970 blacks in Dallas County had not only achieved substantial equality with whites in voting registration (See Findings of Fact 33), but that in doing so they had surpassed the efforts of black leaders in other Alabama counties. By 1976, further gains had been made, and by then blacks comprised approximately 44% of the voting age population and 43.8% of the registered voters. (See Plaintiff's Exhibit 2, also Paragraph 4(a)24, Pretrial Order and Findings of Fact 33)

41. The Court has reviewed and considered the mass of evidence with respect to previous election in Dallas County, including the statistical analysis and expert opinions offered by Plaintiff. This evidence shows that—at least in recent history—blacks have not been elected to any county office in Dallas County. Before 1965, there

were very few black candidates (See, e.g., Paragraphs 4(a)20 and 25 of Pretrial Order; Plaintiff's Exhibits 1, 2, 3, 4, 47, 11, 12, and 45; and Transcript, pp. 1557–1710, 1411–1497, 119–290, 681–758, 1046–1181, 468–680, 911–930, 290–430, 990–1046, 1310–1402). Since 1965 there have been a large number of black candidates for county offices although none has been elected (See Plaintiff's Exhibit 1). Nevertheless, in all of these elections since 1965, blacks were able to register, to vote, to run for office, to campaign, to serve as election officials, and to participate fully in the election process— all without any barriers or obstacles based on race (See Findings of Fact 33, 35, 36, 39, and 40). The following is a complete list of all candidates for County offices since 1966, with the race of each candidate shown: (See Plaintiff's Exhibit 1 and Paragraph 4(a)20 of Pretrial Order)

MAY 3, 1966 – PRIMARY ELECTION

Tax Collector
Davis R. (Dave) Gamble (W)
Lawrence Williams (B)

Sheriff
Wilson Baker (W)
Virgil Bates (W)
James G. (Jim) Clark, Jr. (W)
Murphy F. Suther (W)

Coroner
Fairro Brown (B)
L. H. Hudson (W)

Court of County Revenue – South District
James Boley (W)
Andrew P. Calhoun, Jr. (W)
Robert Culpepper (W)
William J. (Billy) Neighbors (W)
Robert E. H. J. Perry (B)

Court of County Revenue – Fork District
Tom Martin (W)
Johnny Radford (W)

Court of County Revenue – City of Selma
J. D. Hunter (B)
Seawell Jones (W)

MAY 31, 1966 – PRIMARY RUNOFF ELECTION

William J. (Billy) Neighbors (W)
Robert E. H. J. Perry (B)

NOVEMBER 8, 1966 – GENERAL ELECTION

Sheriff
Wilson Baker (W)

Tax Assessor
Mrs. Abbie Lily (B)
Claude A. Sherrer (W)

Tax Collector
Horace D. Griffin, Sr. (B)
Davis R. (Dave) Gamble (W)

Coroner
N. F. Payne (B)
L. H. Hudson (W)

Court of County Revenue – Fork District
A. D. Bush (B)
Johnny Radford (W)
R. D. (Bob) Wilkinson (W)

Court of County Revenue – City of Selma
Mrs. Agatha Harville (B)
Seawell Jones (W)
Ira O. Sullivan (W)

Court of County Revenue – West District
Roosevelt McElroy (B)
R. Furniss Ellis (W)

Court of County Revenue – South District
Wilmer Walker (B)
William J. (Billy) Neighbors (W)

Board of Education, Place No. 3
George Sallie (B)
Fred L. England, Jr. (W)

NOVEMBER 5, 1968 – GENERAL ELECTION

County Board of Education, Place No. 1
John J. (Joe) Grimes (W)
Sullivan Jackson (B)

County Board of Education, Place No. 2
Paul Mayo (W) .
Mrs. Marie P. Foster (B)

MAY 5, 1970 – PRIMARY ELECTION

Judge of Probate
Bernard A. Reynolds (W)
W. B. (Willie) Whitehead (W)

Sheriff
Wilson Baker (W)
C. E. "Buck" Chavers (W)
Mack Roberts (W)

Clerk of Circuit Court
Marguerite H. Houston (W)
Peggy Knight (W)
William A. "Bill" Kynard (W)

Coroner
E. E. Hancock (W)
L. H. Hudson (W)

Court of County Revenue – City of Selma
O. L. (Ed) Edwards (W)
Gordon A. "Jerry" Giraud (W)
Seawell Jones (W)

Court of County Revenue – West District

R. Furniss Ellis (W)
Paul L. Kilgore (W)

JUNE 2, 1970 – PRIMARY RUNOFF ELECTION

Clerk of Circuit Court

Marguerite H. Houston (W)
William A. "Bill" Kynard (W)

NOVEMBER 3, 1970 – GENERAL ELECTION

Sheriff

Wilson Baker (W)

Judge of Probate

Bernard A. Reynolds (W)
Amelia Boynton (B)

Coroner

L. H. Hudson (W)
N. F. Payne (B)

Clerk of Circuit Court

William A. "Bill" Kynard (W)

Judge of Dallas County Court

B. M. Miller Childers (W)

County Commissioner – City of Selma

Seawell Jones (W)

County Commissioner – Fork District

Johnny Radford (W)
A. D. Bush (B)

County Commissioner – West District

R. Furniss Ellis (W)
Roosevelt McElroy (B)

County Commissioner – South District

William J. (Billy) Neighbors (W)
George Sallie (B)

Board of Education, Place No. 4

Joe K. Rives (W)

Board of Education, Place No. 5

William R. "Bob" Martin (W)

MAY 1972 – PRIMARY ELECTION

Tax Assessor

Lorenzo (Brother) Johnson, Jr. (W)
Claude A. Sherrer (W)

NOVEMBER 7, 1972 – GENERAL ELECTION

County Board of Education, Place No. 3

Fred L. England, Jr. (W)

MAY 7, 1974 – PRIMARY ELECTION

Sheriff

Wilson Baker (W)
H. Leo Nichols (W)
Mack Roberts (W)

Coroner

Marius J. "Ace" Anderson (B)
L. H. Hudson (W)
Kenneth R. Lawrence (W)
James C. Rutledge (W)

County Commission – City of Selma

Gordon "Jerry" Giraud (W)
Seawell Jones (W)
Willard T. Jones (W)

County Commissioner – South District

Fairro Brown (B)
William J. (Billy) Neighbors (W)
E. Morris Williams (W)

County Commissioner – West District

R. Furniss Ellis (W)
M. M. Etheridge (W)

County Commissioner – Fork District

Fred Baldwin (W)
D. J. Barnes (W)
George M. Cook, Sr. (W)
Lee A. Henderson (W)
Johnny Radford (W)
James Vines (W)
L. A. "Billy" Wimberly (W)

County Board of Education, Place No. 2

Martin Chance (W)
Paul D. Mayo (W)

JUNE 4, 1974 – PRIMARY RUNOFF ELECTION

Coroner

Marius J. "Ace" Anderson (B)
L. H. Hudson (W)

County Commissioner – Fork District

Fred Baldwin (W)
Johnny Radford (W)

NOVEMBER 5, 1974 – GENERAL ELECTION

Sheriff

Wilson Baker (W)

Coroner

Calvin Strickland (W)
L. H. Hudson (W)

County Commissioner – City of Selma

Seawell Jones (W)

County Commissioner – South District

William J. (Billy) Neighbors (W)

County Commissioner – West District

R. Furniss Ellis (W)

County Commissioner – Fork District

Bob Slone (W)
Fred Baldwin (W)
Johnny Radford (W)

County Board of Education, Place No. 1

J. J. (Joe) Grimes, Sr. (W)

County Board of Education, Place No. 2

Martin Chance (W)
Gloria Meadows (B)

MAY 4, 1976 – PRIMARY ELECTION

Judge of Probate

Samson Crum, Sr. (B)
John W. (Johnny) Jones, Jr. (W)
Joe Knight (W)
Johnny Radford (W)

County Board of Education, Place No. 4

William Dillard (B)
Joe Rives (W)

County Board of Education, Place No. 5

W. R. "Bob" Martin (W)
Louis Padgett, Jr. (B)

NOVEMBER 2, 1976 – GENERAL ELECTION

Judge of Probate

Joe Grimes (W)
John W. "Johnny" Jones, Jr. (W)

County Board of Education, Place No. 4

Joe Rives (W)

County Board of Education, Place No. 5

W. R. "Bob" Martin (W)

SEPTEMBER 5, 1978 – PRIMARY ELECTION

Sheriff

W. D. "Cotton" Nichols (W)
C. T. "Sgt." Stewart (W)
Charles Allen "Leo" Walker (B)

Coroner

Willie Frank King (B)
Kenneth Lawrence (W)

Tax Assessor

Lee Calame (W)
Dale R. Curry (W)
Jean Edwards (W)
A. L. "Al" Turner (W)

County Democratic Executive Committee, Place No. 1

Samson Crum, Sr. (B)
J. W. "Sgt." Pearson (W)

County Commissioner – City of Selma

Seawell Jones (W)
Willard T. Jones (W)

County Commissioner – South District

Andrew Calhoun, Jr. (W)
Bobby "Gene" Norris (W)
Robert E. H. J. Perry (B)

County Commissioner – West District

R. Furniss Ellis (W)
W. H. "Bill" Kendrick (W)
Joseph Pettway (B)

County Commissioner – Fork District

C. Stanley "Stan" Baldwin (W)
George Cook (W)
James R. Friday (W)
Lee A. Henderson (W)
Walter C. Massey (W)
Ed Rush (W)

County Board of Education, Place No. 2

Gerald O. "Gerry" Harvin (B)
James Priestley (W)

SEPTEMBER 26, 1978 – PRIMARY
RUNOFF ELECTION

Tax Assessor

Lee Calame (W)
Dale R. Curry (W)

County Commissioner – South District

Andrew Calhoun, Jr. (W)
Bobby E. "Gene" Norris (W)

County Commissioner – West District

W. H. "Bill" Kendrick (W)
Joseph Pettway (B)

County Commissioner – Fork District

C. Stanley "Stan" Baldwin (W)
James R. Friday (W)

NOVEMBER 7, 1978 – GENERAL ELECTION

Coroner

Kenneth Lawrence (W)

Tax Assessor

Dale R. Curry (W)

Tax Collector

Davis R. "Dave" Gamble (W)

County Commissioner – City of Selma

Seawell Jones (W)

County Commissioner – South District

Bobby E. "Gene" Norris (W)

County Commissioner – West District

W. H. "Bill" Kendrick (W)

County Commissioner – Fork District

C. Stanley "Stan" Baldwin (W)

County Board of Education, Place No. 2

James N. Priestley (W)

As shown above, many blacks have been candidates for county offices in Dallas County since 1966, but none have been elected. The mere fact that there have been a large number of black candidates is "suggestive of the fact that there is minority access to the nomination process." *Hendrix v. Joseph,* 559 F.2d 1265, 1268 (5th C.C.A., 1977). However, on the question of whether blacks have been denied equal access to the political process, the fact that many blacks have run for office is no more determinative than the fact that their efforts were unsuccessful. The Court has therefore examined other factors to determine whether blacks have been effectively

denied equal access to the political process in Dallas County. (See Findings of Fact 33, and 42–50). The Court has followed the precepts pronounced in *Rogers v. Lodge, supra; Lodge v. Buxton, supra; Nevett v. Sides, supra;* and all authorities therein discussed.

42. There appear to be no white organizations in Dallas County which actively slate or endorse candidates for local offices. However, there are a number of black organizations, political groups and leadership coalitions within the black community in Dallas County which have—at least since 1966—traditionally and regularly endorsed and supported candidates for local office. For example, state and national groups such as the NAACP, the Alabama Democratic Conference, and the Southern Christian Leadership Conference have been active for many years. County-wide groups have included the Dallas County Voters League, the Dallas County Improvement Association, and the Selma-Dallas County Black Leadership Council. Other organizations have represented different areas within the County, or within the black community, such as the Selmont Improvement Association, the Black Caucus, and the Black Focus. Black churches have long provided a focal point for political action, as have black financial institutions (including credit unions), business groups, social clubs, civic groups, and fraternal organizations (such as the Elks Club). At the present time the Selma-Dallas County Black Leadership Council acts as an umbrella group, which has brought together black leaders from all segments, groups, and political factions within Dallas County. The Black Leadership Council is comprised of representative black leaders selected by business, church, civic, social, fraternal and political organizations and groups within the county. The Black Leadership Council actively promotes voter registration and political activities within the black community, and it screens, endorses, and supports candidates for local office—both black and white. As will be more fully shown elsewhere in these Findings, no candidate for local office in Dallas County may now reasonably expect to win election without substantial support from the black community. Indeed, the lack of such black support has proved fatal in the past to a number of office-holders, including former Sheriff James G. Clark, Jr., School Board Chairman Paul D. Mayo, Circuit Clerk Margurite H. Houston and County Commissioners Andrew Calhoun, Jr., R. Furniss Ellis, Johnny Radford and Tom Martin.

43. Black political leaders have been exceptionally able and active in Dallas County. Consequently, the support of various black leaders and black political groups has been openly sought and obtained by various candidates—both black and white (Transcript, pp. 119–290, 681–758, 1046–1181, 468–680, 1310–1402, 431–467, 290–430, 794–843, 2242–2244, 2508, 2633, 2936–2938, 724–725, 572. Also Findings of Fact 41, 43, 44, 51, and 52). The Court has reviewed the election returns since 1966, and certain voting patterns are clearly evident. At times there has been a high degree of unanimity within the black community, resulting in substantial black votes for the favored candidates. However, at other times there have been deep divisions within the black community, accompanied by political strife and resulting in fragmented black support. These divisions have occurred not only in races where whites were opposing whites, but also in races where blacks were opposing whites. For example, Probate Judge John W. Jones, Jr. was originally elected in the May 4, 1976 Democratic Primary, winning without a runoff against two white and one black opponents. In that race it is evident that Judge Jones received a substantial number of black votes, even though he was then opposed by Mr. Samson Crum, Sr., a major political leader within the black community. In 1978, blacks overwhelmingly supported Sheriff W. D. Nichols over a black candidate (who was not regarded as qualified or viable) who received very little black support. In the 1966 general election many of the black candidates were nominees of the Black Panther Party, while in the 1968 and 1970 general elections many of the black candidates were nominees of the

National Democratic Party of Alabama. Both of these parties were predominantly black, and were supported primarily by black voters. However, the returns indicate that many black voters elected not to support the black nominees of those political organizations, but instead voted for their white opponents. In both the 1976 and 1980 elections for Mayor of Selma, the black leadership was divided between Mayor Joe T. Smitherman and his white opponents. However, Mayor Smitherman easily won both elections without a runoff, carrying approximately 80% of the black vote in 1976 and 75% in 1980. Black voters have demonstrated a tendency to support incumbent white office-holders. This tendency is most prevalent where the white incumbents are opposed by other whites, although it is evident that white incumbents have also received black support even against black opponents. (Transcript, pp. 1398, 1354–1355, 1341–1343, 1033–1034, 679) Black support has usually been necessary to win local elections, and there have been many races where black voters have determined the outcome. This has been true in several instances where white incumbents were defeated by white opponents who received substantial black support. Thus, for example, County Commissioner Andrew Calhoun, Jr., was defeated by Gene Norris in 1978; County Commissioner R. Furniss Ellis was defeated by W. H. Kendrick in 1978; County Commissioner Johnny Radford was defeated by Fred Baldwin in 1974; County Commissioner Tom Martin was defeated by Johnny Radford in 1966; Circuit Clerk Margurite H. Houston was defeated by W. A. Kynard in 1970; and Sheriff James G. Clark, Jr. was defeated by Wilson Baker in 1966. Similarly, a number of local officials have been elected with substantial black support, including Tax Assessor Dale R. Curry (1978); Sheriff W. D. Nichols (1978); Mayor Joe T. Smitherman (1976 and 1980); Probate Judge John W. Jones, Jr., (1976); Sheriff Wilson Baker (1974 and 1970); Probate Judge B. A. Reynolds (1970); County Commissioner C. Stanley Baldwin (1978); County Commissioner Seawell Jones (1978, 1974 and 1970); and County Commissioner R. Furniss Ellis (1974) (See Plaintiff's Exhibit 1 and Paragraph 4(a)20 of Pretrial Order). In Dallas County white candidates have actively and publicly sought the support of black voters; however, the converse is not true, and black candidates have seldom (if ever) actively and publicly sought the support of white voters. There has been no white "backlash" among white voters, as there has been in many other Alabama counties. In Dallas County black support has generally been openly sought, and regarded as essential to victory, and there has thus been no "backlash" of white opposition to those white candidates who have been fortunate enough to obtain public black support.

44. Incumbent local office-holders have generally recognized the necessity for obtaining and retaining black support in order to remain in office. Consequently, incumbent local office-holders (both at Selma City Hall and Dallas County Courthouse) must acknowledge and respond to black needs and interests, and must remain accessible to black citizens and black leaders. It is significant that at this time the Probate Judge, the Sheriff, the Mayor of Selma, the Tax Assessor, the Circuit Clerk, and most (3 of 4) of the County Commissioners were all elected with substantial black support. (See Findings of Fact 41, 42, also Transcript, pp. 119–290, 681–756, 1046–1181) It is equally significant that many of Plaintiff's witnesses were black leaders who have attained substantial influence in local government. For example, Reverend F. D. Reese is an incumbent City Councilman, and Mr. Edwin L. Moss is Chairman of Craig Field Airport and Industrial Authority, a major public body in Dallas County (as previously noted, Mr. Moss was recently appointed as a member of the Dallas County Board of Registrars). These witnesses— by their very presence—afford evidence of black access to the political process and influence within that process.

45. Another issue raised by the evidence is whether there is racial polarization in white and black voting. Racial polarization has been defined as "white voting for white

and black for black if a white is opposed to a black, or if the race is between two white candidates and one candidate is identified with a favorable vote in the black wards, or identified with sponsoring particularized black needs.", accompanied by a white backlash "which usually results in the defeat of the black candidate or the white candidate identified with the black". *Bolden v. City of Mobile,* 423 F.Supp. 384, 388 (S.D.Ala., 1976), aff'd 571 F.2d 238 (5th C.C.A., 1978), rev. 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). As previously discussed, black support has generally been actively and publicly sought by all white candidates, and there has been no white backlash and no substantial polarized voting in races involving only white candidates. However, in those races in which whites have opposed blacks, there has been evidence of polarization in the voting of both white and black voters (See Findings of Fact 43, and 44). In such races white voters have generally supported white candidates and black voters have generally supported black candidates. However, there have been a number of exceptions to this practice; the most notable being the 1976 election in which Probate Judge Jones defeated Mr. Samson Crum, Sr., and the 1978 election in which Sheriff W. D. Nichols defeated Mr. Charles Allen Walker. In those races where whites have generally supported whites and blacks have generally supported blacks, there were other independent variables—other than race—which might contribute to and partly account for this result. For example, in those races involving NDPA and Black Panther candidates, polarization among white voters was predictable because of the traditional Democratic Party loyalties among whites, as well as the perception among whites that they were unwelcome in those predominately black parties. These results—at least within the white community—were also influenced by traditional patterns of white support for incumbent office-holders, as well as the fact that black candidates usually did not campaign in the white community (Transcript, pp. 681–758, 456–458, 790–791, 1351–1352, 1046–1181, 119–290 and 681–758) and did not utilize media advertising. Incumbents usually enjoy a high success rate, not only because of the traditional support given incumbent office-holders, but also because of certain other advantages of incumbency, such as name identification, an existing organization structure, and access to patronage in the form of projects that affect voters. Thus it is probably inaccurate to conclude that white voters who have voted for white incumbents against black opponents have been influenced solely or even primarily by race, since obviously there are other factors which could account for that same result. On the other hand, black voters who have supported black candidates over white incumbents probably were motivated more by racial than other factors. In any event the evidence does indicate that—for whatever reasons—there has been voting along racial lines among both black and white voters in most of those races in which white candidates were opposed by black candidates.

46. The racial polarization previously discussed did not constitute the only reason for the failure of blacks to win elections. In many elections black candidates ran as nominees of the NDPA and Black Panther Party, and thus lacked the traditional support given Democrats. Blacks usually ran against incumbents who benefitted from the advantages of incumbency. Blacks also have seldom actively sought white votes or utilized media advertising to the same extent as their white opponents. (Transcript, pp. 1557–1710, 119–290, 681–758, 1046–1181, 456–458, 790–791, 1351–1352). However, there is an even more compelling reason why black candidates have not been successful. Since 1966 blacks have comprised approximately 44% of the total voters. (See Plaintiff's Exhibit 2) In most elections the voter turnout has been pitifully small, and the outcome has been determined more by voter apathy than by racial polarization. (See Findings of Fact 41 and 46) A rare exception occurred in 1966, when Sheriff Jim Clark was defeated by Wilson Baker by a heavy black turnout. Voter apathy has not been confined to the black community, but is apparent among white

voters as well. If blacks could have overcome voter apathy and turned out a high percentage of their votes, they could easily have elected black candidates despite polarization. The Court finds that in Dallas County the racial polarization which exists has not produced a white backlash, does not generally affect white voters in races involving only whites, and is evident only in some (but not all) races in which blacks have opposed whites, and even then in varying degrees. The polarized voting which has been found can, in part, be explained by other factors, but race has obviously played some role. Although the polarization in black and white voting is an obstacle to black success at the polls, voter apathy among blacks constitutes a far greater barrier. The Court therefore finds that the polarization which exists among white and black voters in Dallas County has little bearing on the equal access of blacks to the Dallas County political system, or the system of slating and electing candidates.

47. As previously noted, Dallas County has a history of discriminatory practices against its black citizens, going back from 1965 to slavery times. (See Findings of Fact 33 and 38) However, since passage of the 1965 Voting Rights Act those previous discriminatory practices have been eliminated, and no longer pose barriers to black access to the Dallas County political system. (See Findings of Fact 35, 36, 39, 40, 41, 43, 44, and 55) That such past discrimination has existed is without dispute. However, it is equally clear that such past discrimination no longer precludes the present effective participation by blacks in the election system in Dallas County. As previously noted, blacks are now able to register, vote, run for office, serve as election officials, campaign and otherwise participate fully in the election process. (See Findings of Fact 35, 36, 39, 40, 41, 42, 43, 44, and 45) The black community has developed knowledgeable, influential and sophisticated political leaders who have achieved significant influence and power in Dallas County politics. (See Findings of Fact 42, 43, and 44) Among citizens of voting age, blacks have registered to vote in substantially the same

percentages as whites. (See Findings of Fact 33, 35 and 36) However, in most elections the voter turnout of all races has been extremely low, with the turnout somewhat lower among blacks than the whites. This evidences a general voter apathy among both whites and blacks, so that the outcome of most elections has been determined more by the number of voters who stayed home than by the votes of those who participated. This voter apathy does not demonstrate a lack of access to the election system by whites or blacks, but does reflect a lack of interest in utilizing such access by exercising the right to vote. The failure of blacks to win elections is clearly more attributable to voter apathy than to racially polarized voting. The Court has considered whether voter apathy among black voters is the result of prior discrimination, and concludes that it is not. Admittedly there is a disparity in socio-economic levels among whites and blacks. The 1970 census figures showed such disparity in educational levels as well as income levels. (The Court has taken judicial notice of the 1970 census information. Also see testimony of Dr. Charles Cottrell, Transcript, pp. 1557–1710) Although current figures for Dallas County are not available, the Court is convinced that blacks still generally occupy lower socio-economic levels than whites, although the gap probably is not as wide as previously. On balance, the Court concludes that voter apathy among blacks is not the result of prior discrimination, but is probably caused by the same factors which have resulted in voter apathy among whites.

48. Plaintiff has failed to establish that black citizens are geographically concentrated in Dallas County in ghettos or barrios. (Plaintiff neither asserted or attempted to prove any such claim.) Instead, the evidence has shown that black citizens are generally dispersed throughout Selma and Dallas County, and that blacks and whites generally reside in the same localities throughout the County. (See Findings of Fact 37)

49. There is no residency requirement for members of the School Board, other

than residency within Dallas County. (See Paragraphs 4(a)13, 14 of Pretrial Order and Section 16–8–1, et seq., 1975 Code of Alabama) There is a residency requirement for members of the Dallas County Commission, although their election is at-large.

50. The only slating groups within Dallas County have been predominately black, and black voters have had full access to those slating groups. (See Findings of Fact 42, 43, 44, and 45)

51. The evidence reflects that in many elections there have been effective coalitions between blacks and whites. Most of the present major office-holders in Dallas County have been elected as the result of such coalitions, including Probate Judge John W. Jones, Jr., Sheriff W. D. Nichols, Mayor Joe T. Smitherman, Tax Assessor Dale Curry, Circuit Clerk W. A. Kynard, and County Commissioners Seawell Jones, Gene Norris and Stanley Baldwin. (See Findings of Fact 42, 43, and 44)

52. Since 1966 there have been no racial campaigns or racial tactics which have resulted in large turnouts among either white or black voters. In 1966, there was a heated campaign between Sheriff James G. Clark, Jr. and Wilson Baker, and there was a heavy turnout among both white and black voters. The black voters supported Baker, who won primarily because of his black support and the heavy black turnout. (See Plaintiff's Exhibit 1; and Findings of Fact 41, 43 and 45; Also see Transcript, pp. 119–290, 1046–1181).

53. There are no segregated public facilities in Dallas County. All public facilities are desegregated, including schools, parks, stadiums, public buildings and all other public facilities.

54. Plaintiff has offered no evidence of any present discrimination against blacks in Dallas County in the areas of housing, employment, public facilities, or health care. (The Plaintiff neither asserted nor offered proof to support any such claims)

55. On consideration of all of the evidence, the Court concludes and finds that past discrimination in general no longer precludes effective participation by blacks in the election system, and that blacks no longer lack access to the process of slating candidates. Except for the disparity between whites and blacks in socio-economic levels, all other barriers to full political participation by blacks have been removed or eliminated. The reasons for the disparity in socio-economic levels are complex, and Plaintiff has failed to establish by a preponderance of the evidence that such disparity results from the historical discrimination practiced against blacks prior to 1965. (See Findings of Fact 33–54) On balance, the Court is convinced and finds that the evidence preponderates against the Plaintiff and in favor of the County on the issue of whether blacks lack access to the process of slating candidates, as well as the issue of whether the existence of past discrimination in general precludes effective participation by blacks in the election system.

56. The Court has previously addressed each of the *Zimmer* criteria, as well as the "eleven crucial *Kirksey* elements", and has made specific findings as to whether the evidence under each criterion weighs in favor of or against a finding of dilution. Following that procedure, the Court has reached the following conclusions and therefore makes the following specific factual findings, applying the standards prescribed in *Nevett,* supra, *Lodge,* supra and *Rogers,* supra.

a. Blacks do not lack access to the process of slating and electing candidates in Dallas County. (See Findings of Fact 35, 36, 39, 40, 41, 42, 43, 44, 45–47, 50, 51, 52, 55) This weighs against a finding of dilution.

b. The County Defendants have been fully responsive to the particularized interests and needs of blacks. (See Findings of Fact 37a–37j) This weighs against and precludes a finding of dilution.

c. There is a firm, long-standing county policy favoring the at-large election of the County Commission members in Dallas County. There is not a firm, long-standing state policy favoring the at-large election of County Commission members. This criterion is neutral.

d. There has been discrimination in the past, but the existence of such past discrimination no longer precludes the effective participation of blacks in the election system in Dallas County. (See Findings of Fact 55. Also Findings of Fact 33–54) This weighs against a finding of dilution.

e. The County Commission is elected at-large in Dallas County with district residency requirements. (See Paragraphs 4(a)11, 12 and 13) When compared to that of other counties in Alabama, neither the size nor population of Dallas County is unusually large. (See Paragraph 4(s)25 of Pretrial Order) The media is concentrated in Selma, so the cost of a media campaign would be no more in an at-large race than in a race for smaller districts. The Court therefore concludes that this criterion is neutral.

f. There is no majority vote requirement in any general election held in the State of Alabama, but the laws governing primary elections require a majority vote for nomination. (See Findings of Fact 11 and Paragraph 4(a)15 Pretrial Order) The Democratic Party is the primary but not exclusive pathway to election, and one member of the School Board is a Republican (Mr. John J. Grimes, Sr. See Plaintiff Exhibit 1). Political parties also have the opportunity to nominate candidates by caucus and convention, and this has been done by the NDPA, the Black Panther Party, and other political parties. (See Paragraph 4(a)16, Pretrial Order; and testimony of Dr. Charles Cottrell, Transcript pp. 1557–1710) Nevertheless, the evidence weighs in favor of a finding of dilution on this criterion.

g. There are no anti-single shot voting provisions in the general election laws governing the election of members of the County Commission and other elective offices in Alabama. (See Paragraph 4(a)18 of Pretrial Order and Findings of Fact 17) Candidates for nomination and election to the County Commission run for a designated single position, pursuant to the established laws and firm, long-standing policies of the State of Alabama. (See Findings of Fact 6, 11, and Paragraphs 4(a)6, 13, 14, 17, and 18 of Pretrial Order) This criterion is neutral.

h. There is provision for at-large candidates running from specific geographical subdistricts by virtue of the residency requirements for County Commission. The Court finds that this factor weighs in favor of the defendants.

i. In modern times, no blacks have been elected to a county office. (See Findings of Fact 41, and Plaintiff's Exhibit 1) This weighs in favor of finding dilution.

j. Until 1966 the poll tax, a literacy test, and a voucher of good character from a registered voter were all prerequisites to registration in Alabama. (See Findings of Fact 17, and Paragraph 4(a)19 of Pretrial Order) This weighs in favor of finding dilution.

k. There are no property requirements for candidates for the County Commission or other county offices in Dallas County (See Findings of Fact 11, 27) This weighs against a finding of dilution.

l. There has been no evidence as to the disqualification of any black candidate by county election officials. Instead, the evidence reflects laxity by election officials suggestive of partiality to blacks, since at least one black candidate (a convicted felon) was permitted to seek election with known disqualifications. (See Plaintiff's Exhibit 2 and Transcript, pp. 119–290 and 1046–1181) This weighs against a finding of dilution.

m. Although there is some disparity in the socio-economic levels between whites and blacks, the lower socio-economic level of blacks does not have the effect of precluding the ability of blacks to participate in the political process. (See Findings of Fact 39, 47 and 55) The preponderance of the evidence clearly shows that blacks not only have full access to the political process in Dallas County, but that black leaders effectively participate in and utilize those political processes. (See Findings of Fact 35, 36, 39, 40, 42, 43, 44, 47, 50, 51, 52 and 55) Nevertheless, the lower socio-economic levels of blacks weighs in favor of a finding of dilution.

n. There are no known electoral mechanisms which discriminate against blacks.

See Findings of Fact 6, 11, 12, 15, 16, 17, 18, 35, 36, 39, 40, 43, 55; Paragraphs 4(a)6, 13, 14, 15, 16, 17 and 18 of Pretrial Order and Transcript 681–758, 119–290 and 1046–1181) This weighs against a finding of dilution.

57. The Court has viewed the above findings under the above *Nevett, Zimmer* and *Kirksey* criteria, in the aggregate, and as a whole, and has given due regard to the significance and strength of the findings under each of those criteria, all as required by *Nevett, Lodge* and *Rogers*. Having done so, and having viewed those findings in the aggregate, the Court now finds that the ultimate inference of dilution is not possible under those criteria and findings, but that to the contrary, the evidence and findings under those criteria preponderates against any finding of dilution.

58. The Court has not confined its consideration of the evidence solely to the *Zimmer* and *Kirksey* criteria, but has also considered all other evidence and factors deemed relevant to the ultimate issue of dilution as required by *Nevett,* supra, *Lodge,* supra and *Rogers,* supra. In doing so, the Court has also considered and given due regard to the contested issues of fact stipulated and set forth in the Pretrial Order. The Court has reached the following additional Conclusions, and makes the following further and additional factual findings as to the factual issues framed by the Pretrial Order:

a. As a result of the at-large electoral system used to elect members of the County Commission, black citizens of Dallas County do not have less opportunities than white citizens to participate in the political process and to elect members of their choice to the County Commission.

b. The at-large electoral system does not dilute the voting strength of black voters in Dallas County.

c. Black voters are not largely concentrated in certain geographical areas of the County, but instead are widely dispersed throughout Dallas County and the City of Selma. There are, of course, areas with larger black populations (such as rural areas west and south of Dallas County), but black and white citizens reside in all geographical areas of the County.

d. The Court has made detailed and specific findings on whether, and if so when, voting for state, district, county, and local offices in Dallas County has followed racial lines. Those findings are complex, and will not be repeated here, but they do not support a finding that the existence of past discrimination in general precludes the effective participation of blacks in the election system.

e. At least in modern times, no black has been elected or nominated as candidate of the Democratic or Republican party for a position on the School Board or the Dallas County Commission. Blacks have been the nominees of the Black Panther Party and the National Democratic Party of Alabama, both of which were predominately black organizations.

f. There has not been a lack of responsiveness by the County Commission to the needs of the black citizens and voters of Dallas County.

g. In the past, the State of Alabama and Dallas County have unlawfully discriminated against black residents of Dallas County by disenfranchising black voters through the use of discriminatory devices such as literacy tests and poll taxes, and by applying more stringent registration requirements to black prospective voters. Those practices have not been followed since at least 1966, and neither the State nor Dallas County now unlawfully discriminates against black residents of Dallas County by such means.

h. Black voters of Dallas County have been the subject of unlawful discrimination in education, employment, housing, public accommodations and public facilities, all prior to 1966. Since 1966, there has been no such unlawful discrimination against black voters of Dallas County.

i. The past history of racial discrimination in Dallas County by state, local and party officials, particularly with respect to public education and minority participation

in the electoral process, does not now adversely affect minority participation in the political process. There is no present effect of such past discrimination.

j. There is a firm, long-standing state policy favoring the at-large election of members of the County Commission in Dallas County. However, the Court finds the state policy across the state neutral.

k. The at-large election method does not adversely affect black or minority participation in the electoral process in Dallas County.

l. The majority vote requirement in primary elections, and the use of numbered places and staggered terms for members of the School Board, do not dilute or minimize minority voting strength in the context of the at-large electoral system.

m. Black citizens of Dallas County have full and complete access to the process of slating and electing candidates for nomination and election to the School Board, the Dallas County Commission, and other elective offices of Dallas.

n. The County Commission Defendants have been responsive to the particularized needs of black citizens within Dallas County.

o. There has been no past discrimination against black citizens of Dallas County which now preclude the effective participation of black citizens in the election system.

p. There has been no racially motivated discrimination or action by any of the County Commission Defendants that infringes on the constitutional rights of black citizens of Dallas County.

q. There is not now and has not been any invidious racial motivation or at-large scheme to deny black citizens effective participation in the election of members of the Dallas County Commission.

r. Intentional and invidious racial discrimination was not a motivating factor in the enactment of the laws and procedures of the State of Alabama prescribing and governing the election of members of the Dallas County Commission.

s. Intentional and invidious racial discrimination has not been a motivating factor in the maintenance of the laws and procedures of the State of Alabama prescribing and governing the election of members of the County Commission.

t. The Plaintiff has failed to establish, by a preponderance of the evidence, that the at-large method of election for the County Commission has been adopted or maintained for discriminatory purposes.

59. Plaintiff has alleged a violation of 42 U.S.C., Section 1971, but has failed to offer any evidence establishing any such violation by either the County Commission or School Board defendants or any other public officials in Dallas County. Blacks now register, vote, run for office, serve as election officials, and otherwise participate fully in the election process in Dallas County, without discrimination and without distinction of race, color or previous condition of servitude. The election laws, standards, practices and procedures followed and applied in Dallas County do not differ from those followed and applied elsewhere in the State of Alabama, including specifically the other 34 Alabama counties having the same at-large election system for the county board of education and the majority of Alabama counties having an at-large election system for its county governing bodies, and they have been applied in Dallas County fairly, equally and without discrimination in determining voter qualifications. In Alabama and Dallas County no literacy test is employed as a qualification for voting in any election. Further, Plaintiff has failed to establish any actual or attempted threats, intimidations or coercion of any black or white citizens of Dallas County for the purpose of interfering with the right of such citizens to vote or to vote as he might choose. The Court therefore finds and concludes that Plaintiff has failed to establish any violation of 42 U.S.C., Section 1971, by either the County Commission or School Board Defendants, or public officials of Alabama or Dallas County or any other private citizen. See *Kirksey v. City of Jackson, Miss.,* 663 F.2d 659 (5th C.C.A., 1981), reh. den. 669 F.2d 316 (5th Cir. 1982).

## INTENT

The Plaintiff introduced expert witness testimony in an effort to show that the 1901 statute under which the at-large method of selection of the county commission was re-established was motivated by discriminatory racial motivation. Dr. J. Morgan Kousser who holds a PhD in history (Transcript, p. 3435, see also vitae) and has authored several articles and works and who is a professor of history and social science and teaches political science (Transcript, p. 3446) testified he has worked for the Plaintiff in the City of Mobile case and has been involved on the Plaintiff side of various other at-large election cases. (Transcript, p. 3448). He testified that the purpose of the enactment of the 1876 statute providing for appointment of the members of the governing body of Dallas County by the Governor was racially motivated (Transcript, pp. 3468–3508). He further testified that the purpose of the enactment of the 1901 statute (Plaintiff's Exhibit A72) was racially motivated (Transcript, pp. 3508–3659, 3555–3556).

Dr. Peyton McCrary, who holds a PhD in history and is a professor of history at the University of South Alabama was also called as a witness. (See vitae) Like Dr. Kousser, he testified that enactment of the 1876 and the 1901 statutes affecting the selection of membership on the Dallas County Commission were racially motivated. (Transcript, pp. 3259–3329, 3300–3301, 3322–3323).

The County Commission defendants presented the testimony of Dr. Allen W. Jones, Archivist for Auburn University, who holds a PhD in history, and is a professor of history at Auburn University. (Transcript, p. 3802). Dr. Jones has written various works on Alabama history and is actively involved in the historical community in Alabama. He testified that the motivation or the purpose of the 1901 statute was not racial. (Transcript, pp. 3930–3933).

Mr. William H. Stewart, Jr. also testified for the County Commission defendants. He holds a PhD in political science and is a professor of political science at the University of Alabama. (See vitae, Defendants' Exhibit D–11, Transcript, pp. 4006–4009). Dr. Stewart gave testimony as to the literature in the political science field as it related to the existence of the at-large form of election at the turn of the century. (Transcript, pp. 4011–4041).

The testimony of these four witnesses covers hundreds of pages and deals extensively with a period of time well exceeding twenty-five years before the turn of the century. The Court has carefully reviewed all of it as it related to the periods of time involved and the issue of intent. While the Court determines not to include any lengthy discussion of this testimony in these findings it does desire to comment on some, but not all, of the factors raised.

The Plaintiff's witnesses related the passage of the challenged statute in February of 1901 to the Constitutional Convention in Alabama which began in May of 1901 and which is generally acknowledged to have provided by various means for the continued disenfranchisement of black citizens in Alabama. (Transcript, pp. 3318, 3545–3546, 3557, 3566–3567) They also characterized the political period in Alabama in 1901 as one of racist politics. (Transcript, pp. 3603–3604) They acknowledged too that the 1901 Convention also disenfranchised poor whites. (Transcript, pp. 3318–3319, 3717–3718) Dr. Kousser testified in effect that the words "the people" as used in newspaper articles and speeches was a code word that meant only white people. (Transcript, pp. 3538–3541, 3488) However, the Court finds no real evidence to support this conclusion.

Dr. Kousser views the requirement of the 1901 statute that a candidate receive a majority vote not only in the county at-large vote but also within his residency district as being motivated by some sinister intent. (Transcript, pp. 3435–3436) Considering the fact that this provision does not apply in primary elections, which determined for all practical purposes the general election outcome, this provision really has no practical operation as the Democratic party nominee has no serious opposition in the general

election. Certainly as relates to the time of enactment there is no evidence which gives the Court any guidance as to the reason for inclusion of this provision.

The Plaintiff's witnesses also take the position that the Democratic legislature and convention in 1901 were aware of certain court cases and as a result thereof felt insecure for the future as respects Democrats who were involved in the passage of the 1901 statute and feared that federal court suits might restore black enfranchisement and result in blacks voting white Democrats out of office. The Court finds this position not well supported by the evidence as relates in any manner to the passage of the statute here being challenged.

While in part acknowledging that other factors than race may have played a role in the motivation behind the enactment of the 1901 statute, the Plaintiff's witness testified to the opinion that race was the sole or predominant motivation. (Transcript, pp. 3399, 3322, 3402–3406, 3409–3410, 3412–3413, 3448, 3471–3473, 3508) This Court believes the evidence more clearly shows that economic as well as political considerations were dominant factors.

The defense witness Dr. Jones' testimony reviewed the politics of the several historical periods (reference transcript, pp. 3837–3838, 3283, et seq.) and testified as to local and state political factors. He noted the strengths and weaknesses and power of the Democratic Party in Alabama during these periods and of the Democrats of the Alabama Black Belt. (Transcript, pp. 3801–3944). He testified about the nature of newspaper organizations during these periods (Transcript, pp. 3915–3916). He noted that the Black Belt democratic leadership exchanged by means of the pre-1901 Constitution, control of the state-wide elective offices in the Executive Branch for control of the Legislature (Transcript, pp. 3906–3988, 3872–3873).

Defense witness Stewart testified concerning the state of the political science literature at the turn of the century, and the testimony was to the effect that it was common for county governing bodies to be elected at-large (Transcript, p. 4014) and highly favored in principle by the political science community (Transcript, pp. 4000–4026).

By various means counsel for the Plaintiff and the county commission defendants questioned or sought testimony concerning the qualifications or research of the opposing experts (See Transcript, pp. 3938–3942, 3826–3827, 4010–4011).

The Court has certainly been enlightened generally as to Alabama history by the testimony of these four witnesses. Nevertheless there has not been produced to the Court any writings of participants in legislature as to the purpose or motivation behind the enactment of the 1901 statute (unless the November 18, 1900 Selma *Record* newspaper article referenced hereto hereinbelow is considered as shedding some light in that regard) nor do the Journals of Legislature provide any insight. All the participants are now dead and the events being considered happened over 80 years ago.

In reciting the above factors and portions of the expert testimony on the issue of intent, the Court does not intend that such recitation or references reflect all factors included in their testimony. As stated hereinabove the Court has carefully reviewed and considered all of this expert testimony in reaching its decision as to the issues of intent. Each of these witnesses acknowledges that there is no direct evidence as to the intent of the four member Dallas County delegation to the Legislature of Alabama in 1901 or to the intent of the entire Legislature of that session as respects the passage of the statute challenged in this lawsuit respecting selection of members of the governing body of Dallas County, Alabama. (Transcript, pp. 3460, 3616, 3663–3668, 3671–3678, 3703–3704, 3710–3711, 3714–3715, 3764–3765, 3300–3302, 3931–3934) The Court notes that out of all of the obviously extensive research by both parties into numerous documentary sources including, but not limited to, newspapers, books, official state records, manuscript collections, incoming and outgoing correspondence of the Governor of Alabama, county

governing body minutes, historical literature and works, the only document produced other than the legislature enactment journal entries is a November 18, 1900 article in a newspaper known as the Selma *Journal* which contains statements purporting to be public pronouncements or quotes from the four member Dallas County delegation to the Legislature of Alabama in which each expresses an opinion to the effect that they support the popular election of county officials. (Plaintiff's Exhibit A–5) Not all of the four quoted statements relate to county offices.

The Court has considered the 1878 enactment which provided for gubernatorial appointment of members of the county governing body. The Court also has examined and considered the journals of the Legislature of Alabama for that session and the session of 1890 and 1900–1901. The relevance of the 1890 journals is that they reveal that then Rep. W. W. Quarles of Dallas County introduced and obtained passage by the House of Representatives of a bill to restore at-large election of county governing body members in Dallas County, which bill failed to pass the Senate.

The Court recognizes that it is probably correct to assume that after passage of the 1876 statute it was just a matter of when the Legislature would reinstitute some form of popular election of county governing body members in Dallas County. One of the Plaintiff's witnesses acknowledges this (Transcript, p. 3745). Realizing that there is no direct evidence of the intent of the Dallas County delegation or the Legislature in 1901, the Court has carefully considered all of the indirect or circumstantial evidence presented to the Court in the form of testimony and documentary exhibits, and from such consideration the Court finds no evidence which reveals the intent of the Dallas County delegation in having the statute enacted or of the Legislature as a whole in enacting the statute challenged here.

One of the main issues in this case centers upon the intent of the Democrats who adopted the at-large electoral scheme in February, 1901. Experts have testified eloquently for both sides. The Plaintiff's experts find discriminatory intent to have been the principal motivation in adopting at-large elections in 1901. By contrast, the Defendants' experts testified that the adoption of the at-large scheme was motivated by a desire of out-of-office politicians to regain office. As Dr. Allen W. Jones, archivist and professor of history at Auburn University in Auburn, Alabama, explained, a politician is effective only when he holds office. With the office comes power and influence. Certainly a politician can survive for a time if he is out of office. But, as Dr. Jones emphasized, power is the lifeblood of politics.

Republicans dominated state politics from the end of the war through 1875 or 1876. As a rule, blacks were solidly within the Republican camp. When the Democrats determined to regain office their strategy necessarily included an attack upon blacks: blacks were Republicans. The Court finds as a fact that the adoption of the at-large system was motivated by one human desire as old as the hills: the group which was out of power wanted to get back into power. Those calling themselves Democrats sought economical and political power. This quest necessitated that the political and economic power of both black and white Republicans be crushed. Properly viewed, the disenfranchisement was a consequence of their political leanings. The Court rejects the conclusions of the Plaintiff's expert witnesses that disenfranchisement was solely racially motivated.

Historical facts never change. Our view of history does, however, change, as our interpretation of historical facts change. In the view of the Court both Dr. Peyton McCrary and Dr. J. Morgan Kousser, the expert witness of the Government, failed to properly assess a quest for power. The testimony of these two slighted basic human motivation in favor of a quasi-scientific analysis. Wooden hypothesis testing with the aid of quantitative analysis obscures the importance of the power struggle. In the view of the Court, return to the

at-large election scheme was adopted because Democrats saw it as an opportunity to consolidate political power and the best means to perpetuate that political power. Statistical analysis has never and, in the opinion of this Court, never will tell the complete story of human drama. It may be a good road map for hindsight but people and their greed are not always predictable by statistics. The slaughter of indians, the use of child labor, the importation of or allowing Mexican labor into this country are but evidence of past and present greed that affect our daily lives and history is not necessarily an event that can be measured by statistics so as to show our intent.

## CONCLUSIONS OF LAW

This Court has subject-matter jurisdiction of this action pursuant to 28 U.S.C. § 1345, 42 U.S.C. § 1973j(f), 28 U.S.C. § 1331, and 28 U.S.C. § 1343(3).

### A. Statutory Claims

Plaintiff United States of America challenges the at-large method of electing the Defendant Dallas County Commission. The United States of America has brought this action under Section 2 of the Voting Rights Act, as amended,[1] and the Fourteenth and Fifteenth Amendments to the United States Constitution. This Court is cognizant of its obligation to decide the case on a statutory basis (i.e., under Section 2) if possible. *New York Transit Authority v. Beazer,* 440 U.S. 568, 582 n. 22, 99 S.Ct. 1355, 1364 n. 22, 59 L.Ed.2d 587 (1979). Consequently, the Court has reviewed the pertinent legislative history underlying the recently amended Section 2 of the Voting Rights Act.[2]

One point that comes out of a review of the legislative history to the 1982 amendments to Section 2 of the Voting Rights Act with crystal clarity: Congress amended Section 2 of the Voting Rights Act "to make clear that proof of discriminatory intent is not required to establish a violation of Section 2." (Senate Report No. 97–417, 97th Cong. 2nd Sess., p. 2, 16 (1982), U.S. Code Cong. & Admin.News 1982, pp. 177, 193 (hereafter cited as "Senate Report")). Congress amended Section 2 "to permit plaintiffs to prove violations by showing

---

1. As amended by the Congress in 1982, Section 2 of the Voting Rights Act provides:

   Sec. 2.

   (a) No voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State or political subdivision in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color, or in contravention of the guarantees set forth in section 4(f)(2), as provided in subsection (b).

   (b) A violation of subsection (a) is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the state or political subdivision are not equally open to participation by members of a class of citizens protected by subsection (a) in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one "circumstance" which may be considered, provided that nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

2. This amendment took effect upon enactment, i.e., June 29, 1982. See Section 6 of the Voting Rights Act amendments of 1982, Pub. Law 97–205.

   There is of course the issue of whether this newly enacted legislation should apply to pending litigation. See generally *United States v. Johnson,* —— U.S. ——, ——, 102 S.Ct. 2579, 2583, 73 L.Ed.2d 202 (1982); *Hutto v. Finney,* 437 U.S. 678, 694–695 n.23, 98 S.Ct. 2565, 2575–76 n.23, 57 L.Ed.2d 522 (1978); *Bradley v. Richmond School Board,* 416 U.S. 696, 710–716, 94 S.Ct. 2006, 2015–18, 40 L.Ed.2d 476 (1976); *Cort v. Ash,* 422 U.S. 66, 76–77, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975); *United States v. Alabama,* 362 U.S. 602, 80 S.Ct. 924, 4 L.Ed.2d 982 (1960); *United States v. The Schooner Peggy,* 5 U.S. (1 Cranch) 103, 2 L.Ed. 49 (1801). Both the House and Senate Floor Managers stated that "Section 2 ... will, of course, apply to pending cases in accordance with ... well established principles...." 128 Cong.Rec. H3841 (daily ed. June 23, 1982) (remarks of Rep. Sensenbrenner); 129 Cong. Rec.S.7095 (daily ed. June 17, 1982) (remarks of Sen. Kennedy).

that minority voters were denied an equal chance to participate in the political process, i.e., by meeting the pr[e]-*Bolden* [*City of Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980)] results test." Senate Report, at 16, U.S.Code Cong. & Admin.News 1982, p. 193.[3]

■ To prevail on a claim of racial vote dilution under Section 2 of the Voting Rights Act, Congress has made it clear that Plaintiffs must "show that the challenged system or practice, in the context of all the circumstances in the jurisdiction in question, results in minorities being denied equal access to the political process." Senate Report, at 27. "The 'results' standard . . . embodies the test laid down by the Supreme Court in *White* [*v. Regester,* 412 U.S. 755, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973)]." Senate Report, at 27, U.S.Code Cong. & Admin.News 1982, p. 205.[4]

■ Section 2 of the Voting Rights Act, as amended by Congress in 1982, prohibits "electoral standards, practices, or procedures that deny minority voters the same opportunity to participate in the political process as other citizens enjoy." Senate Report, at 28, U.S.Code Cong. & Admin. News 1982, p. 206. To establish a violation of the "results" test, Plaintiffs can show a variety of "objective factors" (*id.,* at 28).[5] As the Senate Report stated at pp. 28–29, U.S.Code Cong. & Admin.News 1978, pp. 206–207 (footnotes omitted), these relevant factors include, but are not necessarily limited to, the following:

(a) the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;

(b) the extent to which voting in the elections of the state or political subdivision is racially polarized;

(c) the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;

(d) if there is a candidate slating process, whether the members of the minority group have been denied access to that process;

(e) the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;

(f) whether political campaigns have been characterized by overt or subtle racial appeals;

(g) the extent to which members of the minority group have been elected to public office in the jurisdiction.[6]

See Senate Report No. 97–417, *supra,* at 28–29, U.S.Code Cong. & Admin.News 1982,

**3.** "In pre-*Bolden* cases plaintiffs could prevail by showing that a challenged election law or procedure, in the context of the total circumstances of the local electoral process, had the result of denying a racial or language minority an equal chance to participate in the electoral process." Senate Report, at 16, U.S.Code Cong. & Admin.News 1982, p. 193.

**4.** In *White v. Regester, supra,* the Supreme Court stated that "plaintiffs' burden is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunities than did other residents in the district to participate in the political process and to elect legislators of their choice. 412 U.S. at 765–66, 93 S.Ct. at 2339–40.

**5.** In *White v. Regester,* the Supreme Court observed that the question of whether the political processes are "equally open" to blacks and whites depends upon a searching practical evaluation of the "past and present reality." 412 U.S. at 769–70, 93 S.Ct. at 2341.

**6.** Additional factors that in some cases have had probative value as part of plaintiffs' evidence to establish a violation are:

a) whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group; and

b) whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous. Senate Report at 29.

pp. 206–207. There is no requirement that any particular number of the foregoing factors be proved. (*Ibid*).

■ In applying these principles to this case, a review of the totality of the circumstances shows that the political processes leading up to the nomination and election are equally open to whites and blacks in Dallas County. Black citizens of Dallas County have the same opportunity as white citizens to participate in the political process. Consequently, under the at-large electoral system, black voters have the same opportunity to elect candidates of their choice to the Dallas County Commission. The fact that no black has been elected to the commission proves nothing in this case.

Based upon the Findings of Fact made hereinabove, the Court concludes that under (a) while there was racial discrimination in the past in Alabama, such does not affect the ability of black citizens in Dallas County to fully participate in elections, thus on this factor the Court would find in favor of the Defendants; under (b) there is evidence of some racial polarization however, the Court has found that it does not hinder black access to or participation in the political processes and on this factor the Court would find either in favor of the Defendants or consider it neutral; under (c) the Court's findings are in favor of the Defendants; under (d), there being no candidate slating process (except arguably by the black leadership groups), the Court would find in favor of the defendants; under (e), while the Court does conclude that the black citizens suffer some disadvantages resulting from past racial discrimination in areas such as education and employment, same does not hinder their ability to participate effectively in the political processes, thus the Court finds this factor neutral; under (f) the Court finds no evidence of overt or subtle racial appeals and thus the Court would find this factor in favor of the Defendants; and lastly under (g) there admittedly having been no blacks elected in recent decades in county-wide election, the Court would find this factor in favor of the Plaintiff. The Plaintiff admits that these factors do not require a headcount, but are to be considered as part of the totality.

While the Court recognizes that to-date black candidates have not been successful in recent decades in being elected to office, nevertheless the Court is convinced that the political processes in Dallas County, Alabama are fully open to black citizens and that the effects of past discrimination do not affect the openness of these processes to blacks or their accessibility to such processes.

While the Court has considered the seven factors raised in the Senate Report, it has also considered other factors under the statutory requirement to consider the totality of circumstances. These include the *Zimmer* and *Kirksey* factors. The Court has already found that the county commission has exhibited extensive responsiveness to the county's black citizens.

The Court has carefully considered the totality of the circumstances respecting the openness of the political processes leading or nomination or election in Dallas County and concludes that, considering all of the factors in the aggregate as they are established by the evidence in the record, the political processes leading to nomination and election in Dallas County are equally open to participation by black citizens of the county and that the Plaintiff has failed to meet its burden of proof to establish that the at-large election of members of the county governing body of Dallas County, Alabama is violative of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973, as amended, or 42 U.S.C. § 1971(a)(1).

## B. Constitutional Claims

■ The constitutional claims under both the Fourteenth and the Fifteenth Amendments fare no better than the statutory claims. At the time Plaintiff filed its complaint, the trial of dilution cases in the Fifth Circuit was governed by the pronouncements of the Court of Appeals in the leading cases of *Zimmer v. McKeithen,* 485 F.2d 1297 (5th C.C.A., en banc, 1973), aff'd (on other grounds) 424 U.S. 636, 96 S.Ct.

1083, 47 L.Ed.2d 296 (1976) and *Kirksey v. Board of Supervisors*, 554 F.2d 139 (5th C.C.A., en banc, 1977), cert. den. 434 U.S. 968, 98 S.Ct. 512, 54 L.Ed.2d 454 (1977), aided by the more recent pronouncements of the Supreme Court in *Washington v. Davis, supra,* and *Village of Arlington Heights v. Metropolitan Housing Development Corp., supra.* During the pendency of this action, the Supreme Court issued its decision in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980). The *Bolden* case has been followed by several Fifth Circuit cases, including *Lodge v. Buxton, supra; Cross v. Baxter,* 639 F.2d 1383 (5th C.C.A., 1981); *Corder v. Kirksey,* 639 F.2d 1191 (5th C.C.A., 1981); *Kirksey v. City of Jackson, Miss., supra; Thomasville Branch of NAACP v. Thomas City, Georgia,* 639 F.2d 1384 (5th C.C.A., 1981); *Jones v. City of Lubbock,* 682 F.2d 504 (5th C.C.A., 1981); *McMillan v. Escambia City, Fla.,* 638 F.2d 1239 (5th Cir. 1981); and *Jenkins v. City of Pensacola,* 638 F.2d 1249 (5th C.C.A., 1981). On July 1, 1981, the Supreme Court decided *Rogers v. Lodge,* —— U.S. ——, 102 S.Ct. 3272, 73 L.Ed.2d 1012 (1982), affirming *Lodge v. Buxton, supra.* On July 29, 1982 the amendment of the Voting Rights Act of 1965 was approved (Public Law 97–205, 96 Stat. 131). In both the trial and decision of this action, the Court has tiptoed through the maze of developing law surrounding dilution action, and has attempted to give effect to all of the controlling pronouncements of the appellate courts and the Congress. In doing so, this Court has also attempted to follow the pronouncements of *Nevett v. Sides, supra, Cross v. Baxter,* 604 F.2d 875 (5th C.C.A., 1979) and *McIntosh City NAACP v. City of Darien,* 605 F.2d 753 (5th C.C.A., 1979), which require the trial court in dilution cases to make findings of fact and conclusions of law in sufficient detail, showing that it has considered all relevant evidence, so that an appellate court can fully understand the factual and legal basis for the trial court's ultimate conclusions. These latter requirements have, of necessity, resulted in an extensive discussion of the facts and the law by this Court.

The well-known factors of *Zimmer v. McKeithen, supra* and *Kirksey v. Board of Supervisors, supra* (as expressed in *McIntosh City NAACP v. City of Darien, supra* ) have been carefully considered by the Court as relevant to the sensitive intent review by the Court and to the totality of the circumstances review as relates to the statutory claim.

In *City of Mobile v. Bolden, supra,* the Supreme Court applied to voter dilution cases the same strict standards it had previously applied to all other equal protection claims in *Washington v. Davis, supra,* and *Village of Arlington Heights v. Metropolitan Housing Dev. Corp., supra.* However the Court in that case spoke by a four-justice plurality, with two special concurring opinions and three dissenting opinions.

Following *Bolden,* the Court of Appeals has decided a number of dilution cases. In the leading case of *Lodge v. Buxton, supra,* the Court gave a definitive analysis of the law before *Bolden* and the *Bolden* decision, and attempted to reconcile *Bolden* with prior Fifth Circuit cases. The Court concluded that *Bolden* required proof of a discriminatory purpose in the creation or maintenance of the challenged at-large system in vote dilution actions arising under both the Fourteenth and Fifteenth Amendments; rejected the exclusive use of the *Zimmer* criteria as the means of inferring purpose or intent; required an independent inquiry into intent; limited the *Zimmer* criteria to the extent that they are relevant to the factual context at hand; and somewhat increased the burden of proof on Plaintiffs in dilution cases. However, and more significantly, *Lodge* held that proof of unresponsiveness is necessary to establish proof of the required discriminatory intent, and that absent such proof of unresponsiveness a prima facie case cannot be established. The Court rejected *Zimmer* to the extent it held otherwise.

On July 1, 1982, the Supreme Court affirmed *Lodge v. Buxton* in a 6–3 opinion written by Justice White, joined by Chief Justice Burger and Justices Brennan, Marshall, Blackmun, and O'Connor. *Rogers v.*

*Lodge, supra.* There were strong dissenting opinions by Justice Powell, joined by Justice Rehnquist, and Justice Stevens. In *Rogers* the Supreme Court, by a convincing 6–3 majority, affirmed *Lodge v. Buxton* and its pronouncements as to the correct law to be applied in dilution cases. The Supreme Court: (1) held that dilution cases are subject to the standard of proof generally applicable to Equal Protection Clause", —— U.S. ——, 102 S.Ct. 3275, and thus require proof of a racially discriminatory purpose in the creation or maintenance of the challenged at-large system in actions brought under both the Fourteenth and Fifteenth Amendments; (2) "rejected the notion that a law is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than another; (3) held that the required ". . . discriminatory intent need not be proven by direct evidence", —— U.S. ——, 102 S.Ct. 3276, but may ". . . be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one race than another"; (4) recognized that a judicial determination as to the existence of the required discriminatory purpose ". . . demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available"; (5) concurred with the opinion of the Court of Appeals in *Nevett v. Sides,* 571 F.2d 209 (5th C.C.A., 1978), that in dilution cases the District Court must determine under all the relevant facts ". . . in whose favor the aggregate of the evidence preponderates", —— U.S. ——, 102 S.Ct. 3278, and should therefore consider not only the important evidentiary factors outlined in *Zimmer,* but any other relevant factors as well; (6) recognized that the factual determination of the required discriminatory purpose ". . . is peculiarly dependent upon the facts of each case", —— U.S. ——, 102 S.Ct. 3278, and should be made by the District Court as factual findings; (7) held that in dilution cases the factual findings of the District Court should be given great deference and should not be disturbed on appeal unless clearly erroneous, because such factual findings represent ". . . a blend of history and

an intensely local appraisal of the design and impact of the . . . multimember districts in the light of past and present reality, political and otherwise". —— U.S. —— —— ——, 102 S.Ct. 3278; and (8) refused to disturb the factual findings of the District Court, holding that such findings were entitled to deference under Rule 52, F.R.C.P., and were not clearly erroneous on the record.

In *Rogers,* the Supreme Court afforded great deference not only to the factual findings of the District Court, but also to the refusal of the Court of Appeals to disturb those findings, emphasizing the Supreme Court's ". . . reluctance to disturb findings of fact concurred in by two lower courts". —— U.S. ——, 102 S.Ct. 3279. The Supreme Court discussed those factual findings, and held that they were legally sufficient to sustain the ultimate finding of the District Court that the challenged at-large system was maintained for a discriminatory purpose in violation of the Fourteenth and Fifteenth Amendments. The decision of the District Court was rendered before *Bolden,* but the District Court ". . . demonstrated its understanding of the controlling standard by observing that a determination of discriminatory intent is a requisite to a finding of unconstitutional vote dilution under the Fourteenth and Fifteenth Amendments". —— U.S. ——, 102 S.Ct. 3278. The District Court had recognized "that the evidentiary factors identified in *Zimmer* were to be considered", —— U.S. ——, 102 S.Ct. 3278, but had not relied exclusively on the *Zimmer* factors and had considered "other relevant factors as well". —— U.S. ——, 102 S.Ct. 3278. The District Court had not treated ". . . the *Zimmer* criteria as absolute, but rather considered them only to the extent they were relevant to the question of discriminatory intent". —— U.S. ——, 102 S.Ct. at 3278, citing 639 F.2d at 1376. Speaking for the Supreme Court in *Rogers,* Justice White said: "Although a tenable argument can be made to the contrary, we are not inclined to disagree with the Court of Appeals' conclusion that the District Court applied the proper legal standard." —— U.S. ——, 102 S.Ct. 3278.

The factual findings of the District Court were discussed at some length in *Rogers,* —— U.S. ————————, 102 S.Ct. 3280–81, and will not be repeated here. However, those factual findings in *Rogers* differ substantially and materially from the Findings of Fact made by the Court in the instant case, and serve to illustrate both the reasoning and impact of the holdings in *Rogers* and *Lodge* that "the task before the fact finder is to determine, under all the relevant facts, in whose favor the aggregate of the evidence preponderates", and that "this determination is peculiarly dependent upon the facts of each case". —— U.S. ——, 102 S.Ct. 3278, citing 571 F.2d 224. Based on the Findings of Fact in the instant case, the Court has concluded that the evidence preponderated against the Plaintiff and in favor of the County Commission. *Rogers, supra; Lodge, supra; Bolden, supra; Nevett, supra; Kirksey, supra.*

This Court has carefully considered and reviewed all of the evidence, and has made detailed and specific factual findings. To the limited extent that these factual findings may also embody Conclusions of Law, the Court now adopts those Findings of Fact as Conclusions of Law. In determining that Plaintiff has failed to establish the required discriminatory purpose, this Court has considered and made specific factual findings with respect to all evidence and circumstances relevant to that issue, including the *Zimmer* criteria, the *Kirksey* elements, and all other evidence and criteria, considering all such evidence separately and also in the aggregate and as a whole. The *Zimmer* criteria, as well as the *Kirksey* elements and other evidence, have all been considered as evidence indicative but not dispositive on the question of intent, as required by *Lodge, Nevett* and *Rogers.* The Court has considered the totality of the evidence and the totality of the circumstances, and based on the preponderance of the evidence has made specific factual findings. The Court has viewed those Findings as a whole, in the aggregate, and has given due regard to the strength and significance of each and all Findings, to determine whether the ultimate inference of dilution

is permissible in this action, and if so, whether the evidence preponderates in its favor. As more specifically set forth in the factual findings, the Court has found and concludes that the evidence preponderates against any finding of invidious or discriminatory purpose in either the enactment, operation, or maintenance of the at-large system prescribed for election of the County Commission, and also preponderates against any finding that such at-large electoral system unlawfully diminishes or dilutes the votes of black voters of Dallas County—or any other Alabama county—in violation of the Fourteenth and Fifteenth Amendments. The Court therefore is of the opinion and concludes that judgment in this action should be entered in favor of the County Commission defendants and against the Plaintiff. *Bolden, supra; Lodge, supra;* and *Rogers, supra.*

In concluding that Plaintiff has failed to establish the required discriminatory purpose, the Court has considered the factual findings that the County Commission defendants have been responsive to the particularized needs of black citizens in Dallas County. This finding—standing alone—defeats Plaintiff's claims against the School Board Defendants, since proof of unresponsiveness by the County Commission is an essential element of Plaintiff's prima facie case. *Lodge v. Buxton, supra,* aff'd. *Rogers v. Lodge, supra.* However, the Court has not rested its decision on that basis alone, but has instead also considered and weighed all other evidence to determine whether the required discriminatory purpose may be inferred from the totality of the circumstantial evidence. In doing so, the Court has considered the *Zimmer* criteria, the eleven *Kirksey* elements, and other meaningful factors as "indicative but not dispositive on the question of intent". *Nevett, supra; Lodge, supra;* and *Rogers, supra.* Having weighed and considered all of the evidence separately, and also in the aggregate, as a whole, the Court also has found and concludes that Plaintiff has failed to establish by a preponderance of the evidence that the at-large system prescribed for the election

of the County Commission Defendants has been adopted, operated, or maintained for discriminatory purposes in violation of the Fourteenth or Fifteenth Amendments. The "aggregate" of the evidence preponderates in favor of the County Commission as to each of those ultimate issues. See *Rogers, Lodge* and *Nevett, supra.*

The County Commission Defendants have contended that Plaintiff, in order to prevail under the constitutional claims, must establish an invidious discriminatory purpose in either the adoption or operation of the at-large electoral plan, and that Plaintiff may not prevail merely by proof that such plan has been maintained for discriminatory purposes. The Defendants found some support—at least with respect to Fourteenth Amendment claims—from the strict standards applied to equal protection claims. *Washington v. Davis, supra; Arlington Heights, supra; Personnel Adm'r of Mass. v. Feeney,* 442 U.S. 256, 99 S.Ct. 2282, 60 L.Ed.2d 870. Defendants also found some comfort and support in the plurality opinion in *Bolden.* However, *Lodge, supra,* and *Rogers, supra,* expressly held that Plaintiff may prevail upon proof that the challenged system has been *either created or maintained* for discriminatory purposes, and this Court has therefore rejected the legal arguments of the County Commission Defendants. Thus in concluding that Plaintiff has failed to establish its claims under the Fourteenth and Fifteenth Amendments, the Court has considered not only whether the at-large electoral system was *created or operated* in Dallas County for discriminatory purposes, but has also considered whether that system has been *maintained* for discriminatory purposes. Having done so, however, the Court has found and concludes that Plaintiff has failed to establish the required proof of discriminatory purpose, either in the creation, operation, or maintenance of that at-large electoral system in Dallas County, or to establish a violation of Section 2 of the Voting Rights Act of 1965 as amended, and that judgment is therefore due to be entered against Plaintiff and in favor of the County Commission Defendants.

This Court has had occasion to observe the development of the law and cases of this nature from the point of view of the trial bench for eleven years. From this observation the evidence in this case mandates the result which the Court reaches today. The evidence preponderates that the political process in Dallas County is now open to all. In surrounding counties the black population has reached voting majority status and in exercising their franchise they are now becoming the officeholders in most, if not all, the elected positions. The blacks of Dallas County for the present constitute the minority, albeit a large minority, and it is the opinion of the Court that this balance will most likely shift to where the blacks will constitute the majority or at least one-half the voting strength. To do what is urged upon the Court at this juncture would constitute gerrymandering to insure the election of blacks in Dallas County. If this be fair in Dallas County then in Greene County, Wilcox County, and several others the white minorities should have equal opportunities to insist that the courts gerrymander those counties to insure the election of whites. Clearly this seesaw approach could not be equal justice under the law. Skin color or ethnic background should not be and is of no legal significance. Equal access to the process is what is demanded by the Constitution and, in fact, this was recognized by the Congress in amending the Voting Rights Act and by the Supreme Court in its *Bolden* opinion. It is therefore irrelevant under the circumstances of this case that blacks have not been elected to public office. This case presents a clear test of the principle that "if something isn't broke, don't fix it". If equal access to the political process is ever denied the voters of Dallas County this Court's doors stand open to rectify that condition.

Based upon the foregoing Findings of Fact and Conclusions of Law, the Court is of the opinion that final judgment should be rendered herein against the Plaintiff and in favor of the County Commission Defendants as to all claims asserted by Plaintiff against the County Commission Defend-

ants. Final Judgment will be entered accordingly.